**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------- x
                                                   :
In re                                              :    Chapter 11
                                                   :
VICTOR OOLITIC STONE COMPANY,                      :    Case No. 14-10311
d/b/a INDIANA LIMESTONE CO., et al.,¹              :
                                                   :    (Joint Administration Pending)
                        Debtors.                   :
                                                   :
-------------------------------------------------- x
```

**DECLARATION OF TERRENCE J. REUTELL**
**IN SUPPORT OF FIRST DAY RELIEF**

I, Terrence J. Reutell, being duly sworn, deposes, and says:

1.      I am the Chief Financial Officer and serve on the Board of Directors of Victor Oolitic Stone Company, an Indiana corporation ("VOSC"). I also serve on the Board of Directors of VO Stone Holdings, Inc., a Delaware corporation ("VOSH"). VOSC and VOSH are referred to herein as a "Debtor" and, collectively, as the "Debtors." The Debtors are requesting various types of relief in "first day" applications and motions (collectively, the "First Day Pleadings") in connection with the Debtors' chapter 11 cases (the "Chapter 11 Cases"). I submit this declaration (this "Declaration") in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b) the First Day Pleadings. I am over the age of 18, competent to testify, and authorized to submit this Declaration on behalf of the Debtors.

2.      I have held my current position with VOSC since March 1, 2008. I have held my current position with VOSH since October 11, 2013. As a result of my work for the Debtors and

---

¹       The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): VO Stone Holdings, Inc., a Delaware corporation (4952); and Victor Oolitic Stone Company, an Indiana corporation (4823). The Debtors' address is 301 Main Street, Oolitic, IN 47451.

my review of relevant documents and discussions with other members of the Debtors' management team, I am familiar with the operations, business affairs, and books and records of the Debtors. I have knowledge of the matters set forth herein, and all facts set forth in the Declaration are based on my personal knowledge, my discussions with other members of Debtors' management team, my review of relevant documents, or my opinion based on my knowledge of the Debtors' operations and financial conditions, except as otherwise noted. In making this Declaration, I have relied a great deal on information and materials that the Debtors' employees and advisors have gathered, prepared, verified, and provided to me under my ultimate supervision, at my direction, or for my benefit in preparing this Declaration. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

3.     The Declaration is divided into two parts. Part I provides background information about the Debtors, their business operations, corporate and capital structures, restructuring efforts, and events leading up to the filing of these Chapter 11 Cases. Part II sets forth the relevant facts in support of each of the First Day Pleadings.[2]

## PART I

## BACKGROUND

## I.    THE DEBTORS' BUSINESS

4.     With roots dating back to the mid-1800s, the Debtors are located in the heart of one of the world's richest limestone deposits. The Debtors own 10 quarry sites totaling over 4,000 acres. These sites hold well in excess of 100 years of limestone reserves. Because of the scope of the Debtors' holdings, they are the largest dimensional Indiana limestone quarriers and fabricators in North America. The Debtors began as a supplier of raw block limestone and

---

[2]     All undefined capitalized terms in this Declaration shall be given the meaning prescribed in their respective first day motions.

evolved into the leading provider of a full range of dimensional limestone products in North America.

5.     The Debtors' current corporate structure is the result of the mergers of some of Indiana's most historic and successful limestone companies.  The original Victor Oolitic Stone Company was formed in 1897 and for more than a century provided some of the highest quality limestone in the country.  In 2009, the original Victor Oolitic Stone Company was bought out of a sale pursuant to Bankruptcy Code Section 363 by VOSC.  The original Indiana Limestone Company was formed when twenty-four corporations merged together in 1924.  The next century saw Indiana Limestone complete the order for the Empire State Building, among other notable achievements.  In 2010, the owners of VOSC acquired the original Indiana Limestone Company.  After the purchase, through a series of corporate transactions, the current form of VOSC emerged, choosing to do business as Indiana Limestone Company.

## II.    THE DEBTORS' WORKFORCE

6.     The Debtors employ 137 active employees (the "Employees") for the performance of services in connection with their operations.  The  Employees can be subdivided into four groups:  (i) hourly employees subject to one of four collective bargaining agreements (the "Hourly Union Employees"); (ii) salaried employees subject to one of four collective bargaining agreements (the "Union Salaried Employees," and collectively with the Hourly Union Employees, the "Union Employees,"); (iii) non-union hourly employees (the "Non-Union Hourly Employees"); and (iv) non-union salaried employees (the "Non-Union Salaried Employees," and collectively with the Non-Union Hourly Employees, the "Non-Union Employees").  As of the Petition Date, Debtor VO Stone Holdings, Inc. did not have any employees.

7.      As of the Petition Date, the Debtors' Employees consist of: (i) approximately 73 Hourly Union Employees; (ii) one Union Salaried Employee; (iii) approximately 39 Non-Union Hourly Employees; and (iv) approximately 24 Non-Union Salaried Employees.

## III.    THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE

8.      VOSC is an Indiana corporation while VOSH is a corporation organized in Delaware.  The capital structure is as follows:  VOSC is fully owned by VOSH.  VOSH, in turn, is almost completely owned by North Coast Minerals, LLC ("NCM").  NCM is not a Debtor in these Chapter 11 cases.

9.      Prior to January 30, 2014, the Debtors were party to that certain Amended and Restated Credit Agreement dated as of November 15, 2010, by and between Company and the Lenders (as defined therein) and BMO Harris N.A. as Administrative Agent (collectively, with the Lenders "the Pre-Petition Lenders") (as amended, modified or restated from time to time, the "Pre-Petition Credit Agreement").  The Pre-Petition Credit Agreement included a term loan facility and a revolving loan facility and was evidenced by notes and a security agreement in favor of the Pre-Petition Lenders.  Pursuant to the Pre-Petition Credit Agreement, the Lenders held a security interest in substantially all of the Debtors' property.

10.      As of January 1, 2014, the aggregate outstanding principal and accrued interest under the Pre-Petition Credit Agreement was approximately $53 million (collectively, inclusive of interest, fees, expenses and all Obligations, the "Pre-Petition Loan Indebtedness").  As of the Petition date, the Debtors also have approximately $6 million in general unsecured debt primarily consisting of outstanding notes owed to former owners of the legacy Indiana Limestone Company and trade debt.

## IV.    EVENTS LEADING TO DEBTORS' CHAPTER 11 FILING

11.    Between 2010 and the beginning of 2013, the Debtors renegotiated the terms of the Pre-Petition Credit Agreement several times to respond to the Debtors' cash needs. However, legacy balance sheet issues began to impact the Debtors' operating results.  For instance, the combination of surplus post-merger inventory combined with the Debtors' limited ability to invest in quarrying efficiency led to a significant rationalization of inventory beginning in 2010.  The limited production resulted in less available inventory and a lower profit margin.

12.    As the end of 2013 approached, it became clear to the Debtors that they would be unable to fulfill their commitments under the Pre-Petition Credit Agreement.  On October 31, 2013, the Pre-Petition Lenders and the Debtors entered into a forbearance agreement (the "Forbearance Agreement").  Pursuant to the Forbearance Agreement, the Debtors retained Quarton Partners, LLC ("Quarton") to pursue the sale of substantially all of the Debtors' assets.

13.    Quarton spent November and December of 2013 searching for a buyer of the Debtors' assets, equity and/or debt.  At the end of the sale process, after contacting more than 100 potential purchasers, Quarton hosted ten potential purchasers during on-site visits.  After the on-site visits, Quarton secured at least five signed letters of intent.  The potential purchasers brought substantially different offers, with some offering to purchase the Debtors' equity, and others offered to purchase the Debtors' assets.  With advice from Quarton, and the consent of the Pre-Petition Lenders, the Debtors determined that Indiana Commercial Finance, LLC ("ICF") had presented the Debtors with the highest and best bid.  Instead of bidding for the Debtors' assets, however, Indiana Commercial Finance was one of several bidders who offered to purchase the Pre-Petition Lenders rights under the Pre-Petition Credit Agreement.

14.    On January 30, 2014, the Pre-Petition Lenders and ICF closed on a loan purchase agreement (the "Loan Purchase Agreement") whereby ICF purchased all of the Pre-Petition

Lenders rights under the Pre-Petition Credit Agreement.  Because the amount owed under the

Pre-Petition Credit Agreements had not changed, only who the Debtors were indebted to, the

Debtors determined to initiate these chapter 11 proceedings with the goal of selling substantially

all of their assets for the benefit of the Debtors' creditors.  ICF agreed to provide the Debtors'

with post-petition financing and serve as a stalking horse bidder at the auction the Debtors' plan

to hold approximately seventy-five days after the Petition Date.

**PART II**

**<u>FIRST DAY PLEADINGS</u>**

15.    An important element to the success of the Debtors' Chapter 11 Cases is approval

of the Debtors' requests for First Day Pleadings submitted concurrently herewith.  Generally, the

first day relief has been designed to facilitate: (a) continuing the Debtors' operations in chapter

11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence

and support of employees, customers, vendors, suppliers and certain other key constituencies;

and (c) establishing procedures for the smooth and efficient administration of these cases.  I have

reviewed the First Day Pleadings, including the exhibits thereto, and I believe that the relief

sought in each of the First Day Pleadings is tailored to meet the goals described above and,

ultimately, will be critical to the Debtors' ability to maximize the value of their estates for their

creditors and other stakeholders.

I.    **<u>ADMINISTRATIVE PLEADINGS</u>**

  A.    **Debtors' Motion for Entry of an Order Approving  Joint Administration of Debtors' Chapter 11 Cases (the "Joint Administration Motion")**

16.    The Debtors are seeking the entry of an order directing joint administration of the

Debtors' related Chapter 11 Cases and related relief.

17.     VOSH owns 100% of the outstanding securities of VOSC.  Thus, the Debtors are affiliates under section 101(2) of the Bankruptcy Code.

18.     It will be most efficient for the administration of these cases if the Court authorizes joint administration.  The Debtors anticipate that practically all of the hearings and matters involved in these chapter 11 cases will affect both of the Debtors.  If approved, joint administration will reduce costs, facilitate administrative efficiency, and avoid the procedural problems otherwise attendant to the administration of separate but related chapter 11 cases.  The Court will be relieved of the burden of entering duplicative orders and maintaining duplicative files.  Furthermore, supervision of the administrative aspects of these chapter 11 cases by the United States Trustee for the District of Delaware will be simplified.  Moreover, no party or substantive rights will be prejudiced by the relief requested herein.

19.     Further, joint administration will not adversely affect the Debtors' respective constituencies because the Joint Administration Motion requests only administrative, not substantive, consolidation of the Debtors' estates.  Parties in interest will not be harmed by the relief requested but, instead, will benefit from the cost reductions associated with the joint administration of the Chapter 11 Cases.

20.     I believe that joint administration of the Debtors' Chapter 11 Cases is in the best interests of the Debtors, their estates, and all parties in interest.

**B.     Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors; (b) File a Consolidated List of the Debtors' Top Twenty Creditors; and (c) Complete All Mailings of Notices, Including Notices of the Commencement of These Cases and of the Meeting of Creditors Required by Section 341 of the Bankruptcy Code; and (II) Granting Them Such Other and Further Relief as the Court Deems Just and Proper (the "Consolidation Motion")**

21.     The Debtors have identified in excess of 500 entities or individuals to which notice of certain proceedings in these chapter 11 cases must be provided. The Debtors anticipate

that such notices may comprise, without limitation, notice of: (a) the filing of the Debtors' voluntary petitions under chapter 11 of the Bankruptcy Code, (b) the initial meeting of the Debtors' creditors in accordance with section 341 of the Bankruptcy Code, (c) applicable bar dates for the filing of claims, (d) the hearing on adequacy of the Debtors' proposed bid procedures, and (e) the hearing to confirm the sale of substantially all of the Debtors' assets.

22.     The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the Notices and other documents in these chapter 11 cases.  However, only VOSC has creditors that are entitled to receive the Notices and other documents in these chapter 11 cases.  Accordingly, by the Consolidation Motion, the Debtors seek authority to file the lists on a consolidated basis, identifying their creditors in the format or formats currently maintained in the ordinary course of the Debtors' businesses.

23.     Moreover, concurrently with the Consolidation Motion, the Debtors have filed applications seeking the appointment of Kurtzman Carson Consultants, LLC ("KCC") as noticing, balloting and disbursing agent in these chapter 11 cases.

24.     If the Noticing, Balloting, and Disbursing Agent Applications are granted, KCC will, among other things, (a) assist with the consolidation of the Debtors' computer records into a creditor and security holder database and (b) complete the mailing of the Notices to the parties in these databases.  After consultation with KCC, the Debtors believe that filing the lists in the format or formats currently maintained in the ordinary course of business will be sufficient to permit KCC to notice promptly all applicable parties as required by Local Rule 1007-2.

25.     In lieu of effecting service through the Office of the Clerk of this Court, the Debtors also request that they, or KCC, be approved and authorized to complete all mailings to

creditors and equity holders in these cases, including notice of the commencement of these cases and notice of the meeting of creditors pursuant to section 341 of the Bankruptcy Code.

26.     Allowing the Debtors, or KCC, to complete their own mailings will save significant time and expense.

### C.     Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. §156(C) Authorizing the Employment And Retention of KCC, LLC as Claims and Noticing Agent, Effective *Nunc Pro Tunc* to the Petition Date (the "KCC Application")

27.     The Debtors have hundreds of potential creditors and parties-in-interest that must be given notice of developments related to these chapter 11 cases.  With such a significant number of parties involved in these chapter 11 cases, it is likely that heavy administrative burdens will be imposed upon the Court and the Clerk of the United States Bankruptcy Court for the District of Delaware (the "Clerk's Office").  To relieve the Clerk's Office of these burdens and comply with the Local Rules, the Debtors seek to engage KCC as an independent, third-party notice and claims agent to effectively and efficiently serve notice upon all creditors and other relevant constituencies in these chapter 11 cases, as well as transmit, receive, docket and maintain all proofs of claim and proofs of interest filed in these chapter 11 cases.

28.     KCC is a claims administration firm that specializes in chapter 11 administration, consulting and analysis, including noticing, claims processing, voting and other tasks in the effective administration of chapter 11 cases.  KCC has developed efficient and cost-effective methods to handle the voluminous mailings associated with chapter 11 noticing and claims processing that ensure the orderly and fair treatment of creditors, interest holders and all parties in interest.  The Debtors believe that such assistance will expedite service of notices, streamline the claims administration process and enable the Debtors to focus on the chapter 11 process.

29.    Further, KCC has experience working with, and will continue to work with, the Clerk's Office to ensure that KCC's services conform with all of the Court's procedures, the Local Rules and any orders entered by this Court.  KCC's experience in matters of this size and complexity (or greater) in which it has acted as the official notice and claims agent in this District is extensive.

30.    Specifically, the Debtors seek to engage KCC to provide certain noticing and claims processing services, including:

(a)    Prepare and serve required notices and documents in the case in accordance with the Bankruptcy Code and the Bankruptcy Rules in the form and manner directed by the Debtors and/or the Court, including (i) notice of the commencement of the cases and the initial meeting of creditors under Bankruptcy Code § 341(a), (ii) notice of any claims bar date, (iii) notices of transfers of claims, (iv) notices of objections to claims and objections to transfers of claims, (v) notices of any hearings on a disclosure statement and confirmation of the Debtors' plan of reorganization, including under Bankruptcy Rule 3017(d), (vi) notice of the effective date of any plan and (vii) all other notices, orders, pleadings, publications and other documents as the Debtors or Court may deem necessary or appropriate for an orderly administration of the cases;

(b)    Maintain an official copy of the Debtors' schedules of assets and liabilities and statement of financial affairs (collectively, "Schedules"), listing the Debtors' known creditors and the amounts owed thereto;

(c)    Maintain (i) a list of all potential creditors, equity holders and other parties-in-interest; and (ii) a "core" mailing list consisting of all parties described in sections 2002(i), (j) and (k) and those parties that have filed a notice of appearance pursuant to Bankruptcy Rule 9010; update said lists and make said lists available upon request by a party-in-interest or the Clerk;

(d)    Furnish a notice to all potential creditors of the last date for the filing of proofs of claim and a form for the filing of a proof of claim, after such notice and form are approved by this Court, and notify said potential creditors of the existence, amount and classification of their respective claims as set forth in the Schedules, which may be effected by inclusion of such information (or the lack thereof, in cases where the Schedules indicate no debt due to the subject party) on a customized proof of claim form provided to potential creditors;

(e)     Maintain a post office box or address for the purpose of receiving claims and returned mail, and process all mail received;

(f)     For all notices, motions, orders or other pleadings or documents served, prepare and file or cause to be filed with the Clerk an affidavit or certificate of service within seven (7) business days of service which includes (i) either a copy of the notice served or the docket number(s) and title(s) of the pleading(s) served, (ii) a list of persons to whom it was mailed (in alphabetical order) with their addresses, (iii) the manner of service, and (iv) the date served;

(g)     Process all proofs of claim received, including those received by the Clerk's Office, and check said processing for accuracy, and maintain the original proofs of claim in a secure area;

(h)     Maintain the official claims registers for the Debtors (the "Claims Registers") on behalf of the Clerk; upon the Clerk's request, provide the Clerk with certified, duplicate unofficial Claims Registers; and specify in the Claims Registers the following information for each claim docketed: (i) the claim number assigned, (ii) the date received, (iii) the name and address of the claimant and agent, if applicable, who filed the claim, (iv) the amount asserted, (v) the asserted classification(s) of the claim (e.g., secured, unsecured, priority, etc.), (vi) the applicable Debtor, and (vii) any disposition of the claim;

(i)     Implement necessary security measures to ensure the completeness and integrity of the Claims Registers and the safekeeping of the original claims;

(j)     Record all transfers of claims and provide any notices of such transfers as required by Bankruptcy Rule 3001(e);

(k)     Relocate, by messenger or overnight delivery, all of the court-filed proofs of claim to the offices of Claims and Noticing Agent, not less than weekly;

(l)     Upon completion of the docketing process for all claims received to date, turn over to the Clerk copies of the claims register for the Clerk's review (upon the Clerk's request);

(m)     Monitor the Court's docket for all notices of appearance, address changes, and claims-related pleadings and orders filed and make necessary notations on and/or changes to the claims register;

(n)     Assist in the dissemination of information to the public and respond to requests for administrative information regarding the case as directed by the Debtors or the Court, including through the use of a case website and/or call center;

(o)     If the cases are converted to chapter 7, contact the Clerk's Office within three days of the notice to Claims and Noticing Agent of entry of the order converting the cases;

(p)     Thirty days prior to the close of the cases, to the extent practicable, request that the Debtors submit to the Court a proposed Order dismissing the Claims and Noticing Agent and terminating the services of such agent upon completion of its duties and responsibilities and upon the closing of the cases;

(q)     Within fourteen (14) days of notice to Claims and Noticing Agent of entry of an order closing the chapter 11 case, the agent shall forward to the Clerk (a) an updated claims register; (b) a CD of all imaged claims, and (c) an excel spreadsheet containing all claims information, along with an updated 2002 list and updated creditor mailing list, which shall contain the names and addresses of all creditors, provided in both paper and on disc, in both alphabetical and numerical order and in .txt format; and

(r)     At the close of the case, box and transport all original documents, in proper format, as provided by the Clerk's Office, to (i) the Federal Records Center, 14700 Townsend Road, Philadelphia, Pennsylvania 19154 or (ii) any other location requested by the Clerk's Office.

31.     The Claims Registers shall be opened to the public for examination without charge during regular business hours and on a case-specific website maintained by KCC.

32.     KCC will follow the notice and claim procedures that conform to the guidelines promulgated by the Clerk's Office, section 331 of the Bankruptcy Code or as it otherwise may be directed by the Court.

### 1.     **Professional Compensation**

33.     After a competitive process, the Debtors chose to retain KCC at the rates set forth in the Services Agreement. In addition, before the Petition Date, the Debtors paid a retainer to KCC in the amount of $10,000.00.  The Debtors respectfully submit that KCC's rates for its notice and claims processing services are competitive and comparable to the rates charged by its competitors for similar services.  Additionally, the Debtors compared engagement proposals of three court-approved claims and noticing agents pursuant to the Protocol for the Employment of

Claims and Noticing Agents Under 28 U.S.C. § 156(c) (the "Claims Agent Protocol"), before engaging KCC on the terms included in the Services Agreement.

### 2. Indemnification

34.     As part of the overall compensation payable to KCC under the terms of the Services Agreement, the Debtors have agreed to certain indemnification obligations as specifically enumerated in the Services Agreement, to the extent permitted by applicable law and as set forth in the proposed order attached to KCC's application as Exhibit C.

35.     The terms of the Services Agreement and indemnification provisions included therein were negotiated at arms-length between the Debtors and KCC, and the Debtors respectfully submit that these provisions of the Services Agreement are reasonable and in the best interests of the Debtors, their estates and their creditors.

36.     The Debtors believe that the proposed modifications to the indemnification provisions of the Service Agreement are appropriate under the circumstances, consistent with recent orders entered in this jurisdiction and should be approved.

37.     In view of the number of anticipated claimants and the complexity of the Debtors' business, the Debtors submit that the appointment of KCC as the Claims and Noticing Agent is both necessary and in the best interests of the Debtors' estates and their creditors because the Debtors will be relieved of the burdens associated with the claims and noticing services.

## V.     OPERATIONAL PLEADINGS

### A.     Motion of Debtor for Interim and Final Orders Approving Use of Cash Collateral and Post-Petition Financing (the "DIP Motion")

38.     The Debtors are party to: (a) Pre-Petition Credit Agreement; (b) that certain Replacement Term Note dated as of January 30, 2014, payable by Company to the Lender in the original principal amount of $47,400,000 (as amended, modified or restated from time to time,

the "Term Note"); (c) that certain Replacement Revolving Note dated as of January 30, 2014, payable by Company to the Lender in the original principal amount of $6,000,000 (as amended, modified or restated from time to time, the "Revolving Note"); (d) that certain Security Agreement dated as of November 15, 2010, by and between Company and the Lender (as amended, modified or restated from time to time, the "Security Agreement"); (e) that certain Assignment of Real Estate Mortgage, Assignment of Leases and Rents and Fixture Filing, pursuant to which BMO Harris Bank N.A. ("BMO") as a prior administrative agent under the Credit Agreement, assigned all of its rights, title and interest in, to and under that certain Real Estate Mortgage, Assignment of Leases and Rents and Fixture Filing dated as of November 25, 2009, recorded on December 28, 2009 as Instrument No. 2009021961 in the Office of the Recorder of Monroe County, Indiana (as amended, modified or restated from time to time, "Mortgage 1"); (f) that certain Assignment of Real Estate Mortgage, Assignment of Leases and Rents and Fixture Filing, pursuant to which BMO assigned all of its rights, title and interest in, to and under that certain Real Estate Mortgage, Assignment of Leases and Rents and Fixture Filing dated as of November 25, 2009, recorded on December 11, 2009 as Instrument No. 200900007325 in the Office of the Recorder of Lawrence County, Indiana (as amended, modified or restated from time to time, "Mortgage 2"); (g) that certain Assignment of Real Estate Mortgage, Assignment of Leases and Rents and Fixture Filing, pursuant to which BMO assigned all of its rights, title and interest in, to and under that certain Real Estate Mortgage, Assignment of Leases and Rents and Fixture Filing dated as of November 15, 2009, recorded on December 1, 2009 as Instrument No. 2010018544 in the Office of the Recorder of Monroe County, Indiana (as amended, modified or restated from time to time, "Mortgage 3"); (h) that certain Assignment of Real Estate Mortgage, Assignment of Leases and Rents and Fixture Filing, pursuant to which

BMO assigned all of its rights, title and interest in, to and under that certain Real Estate Mortgage, Assignment of Leases and Rents and Fixture Filing dated as of November 15, 2010, recorded on December 1, 2010 as Instrument No. 201000006581 in the Office of the Recorder of Lawrence County, Indiana (as amended, modified or restated from time to time, "Mortgage 4"); (i) that certain Assignment of Leasehold Mortgage, Assignment of Leases and Rents and Fixture Filing, pursuant to which BMO assigned all of its rights, title and interest in, to and under that certain Leasehold Mortgage, Assignment of Leases and Rents and Fixture Filing dated as of November 15, 2010, recorded on February 13, 2011 as Instrument No. 201100000225 in the Office of the Recorder of Lawrence County, Indiana (as amended, modified or restated from time to time, "Mortgage 5," and collectively with Mortgage 1, Mortgage 2, Mortgage 3, and Mortgage 4, the "Mortgages"); and (j) as further documented, recorded and evidenced by various other agreements, instruments, financing statements and documents in connection therewith and with the Pre-Petition financing arrangements from the Lender to the Debtors (in each case, as amended, restated, supplemented or otherwise modified from time to time, and collectively with the Credit Agreement, the Term Note, the Revolving Note, the Security Agreement, and the Mortgages the "Pre-Petition Agreements").[3]

39.    As of the Petition Date, the aggregate outstanding principal and accrued interest under the Pre-Petition Agreements is approximately $53 million (collectively, inclusive of interest, fees, expenses and all Obligations, the "Pre-Petition Loan Indebtedness").  Without prejudice to the rights of any other party (but subject to the limitations thereon described in Paragraph 26 of the proposed Interim Order), the Debtors acknowledge and stipulate that, in accordance with the terms of the Pre-Petition Agreements, the Debtors are truly and justly

---

[3]    Capitalized terms not otherwise defined herein shall have the definitions set forth in the Pre-Petition Agreements.  The Pre-Petition Agreements are attached to the DIP Motion as Exhibit A.

indebted to the Lender, without defense, counterclaim or offset of any kind, and that as of the Petition Date, the Debtors were liable to the Lender in respect of loans made pursuant to the Pre-Petition Agreements.

40.      The Debtors, under the Pre-Petition Agreements and as security for repayment of the Pre-Petition Loan Indebtedness, granted to the Lender security interests in, and liens upon, substantially all of their assets (the "Pre-Petition Collateral").  Upon information and belief, the Lender's security interests in and liens on the Pre-Petition Collateral are properly perfected and are valid, enforceable and non-avoidable first priority liens on and security interests in the Pre-Petition Collateral, subject to the Prior Permitted Liens (as defined in the Interim Order). Finally, due to the Lender's security interest in the Pre-Petition Collateral, the Debtors' cash constitutes proceeds of the Pre-Petition Collateral and is cash collateral of the Lender within the meaning of Bankruptcy Code § 363(a) ("Cash Collateral").

### 1.      The Debtors' Urgent Need For Post-Petition Financing

41.      The Debtors have insufficient cash to finance their operations, maintain business relationships with their vendors, suppliers, and customers, and to pay their employees.  In order to complete their orderly sale process and maximize the value of their assets for the benefit of their creditors and estates, the Debtors have an immediate need for the financing set forth in the Interim Order.  In the absence of the Post-Petition Financing and the use of Cash Collateral, the orderly sale of the Debtors' businesses and assets would not be possible, and would cause serious and irreparable harm to the Debtors and their estates.

42.      Other than the Post-Petition Financing, there are no superior financing alternatives available to the Debtors under the circumstances.  The Debtors have been exploring financial alternatives for at least six months and are intimately familiar with the lack of financing available to them.  In fact, as noted above, the Debtors previously retained an investment banker

to seek alternatives, including a sale of their assets and/or equity or a debt refinance. The Post-Petition Financing is a direct result of those efforts, as the investment banker's process ended with the Lender's proposed purchase of the Debtors' secured debt. The Debtors, along with their investment banker and their former lenders, determined that the Lender's offer was the highest and best offer among more than eight separate offers to purchase the Debtors' debt, equity and/or assets.[4]  For a number of reasons, including the current state of the financial markets, the size of the financing required, the nature and state of the Debtors' business operations, the immediacy of the Debtors' financing needs, and the liens of the Lender, the Debtors are convinced that they are unable to obtain better financing to address the their urgent liquidity needs.

43.     Indeed, virtually all of the Debtors' assets are encumbered by liens and security interests granted to the Lender.  Thus, even if alternative debtor in possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the Lender, the results of which could not be predicted with certainty.  Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, jeopardizing these cases.  Absent immediate availability of new credit, the Debtors will be forced to cease operations and the going-concern value of their business will be lost.

44.     Accordingly, the Debtors require the availability of working capital from the Post-Petition Financing and the use of cash collateral.  The Post-Petition Financing will provide more

---

[4]     Prior to the Petition Date, the Lender purchased the Loans (as defined in the Pre-Petition Agreements) pursuant to that certain Loan Sale Agreement made as of January 30, 2014, by and among the Lender, as buyer, and BMO Harris Bank N.A., Fifth Third Bank, RBS Citizens Bank, and The Huntington National Bank, as sellers.  Pursuant to that certain Assignment and Assumption dated as of January 30, 2014, the Lender purchased and assumed all of the Assignors' rights and obligations under the Pre-Petition Agreements.

than just the ability for the Debtors to operate their businesses; the facility will instill a sense of confidence in the Debtors' employees, customers, vendors, and other important stakeholders. The Debtors critically need the support of these stakeholders at this time, as the loss of their support could severely impair the Debtors' ability to maximize the value of their estates.

45.     In sum, without the immediate access to Post-Petition financing, the Debtors expect to suffer an acute cash shortage that would immediately and irreparably harm their estates and creditors.  Furthermore, the Debtors lack sufficient funds to meet expenses necessary for the continued operation of their business before the Final Hearing on the DIP Motion can be held, and, therefore, it is essential that the Debtors obtain the proposed interim financing from the Lender.  The Debtors' ability to remain viable and preserve the value of the Debtors' estates for the benefit of their creditors depends upon the interim and final relief requested in the Motion.

### 2.     Summary of The Debtors' Proposed Post-Petition Financing[5]

46.     The Debtors have determined, in the exercise of their sound business judgment, that to meet their working capital needs they require a Post-Petition credit facility in substantially the form described herein.  Accordingly, subject to the Court's approval, the Debtors have determined to enter into post-petition Financing with the Lender.

47.     The terms of the Post-Petition Financing are more specifically set forth in the proposed Interim Order attached as Exhibit B to the DIP Motion.  To save unnecessary administrative expense, the Post-Petition Financing will be on the same terms as the Pre-Petition Credit Agreement to the extent that it does not contradict the Interim Order.  Additionally,

---

[5]     The summaries and descriptions of the terms and conditions of the Post-Petition Financing and the proposed Interim Order set forth in the DIP Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in their entirety by the Interim Order.  In the event there is a conflict between the DIP Motion and the Interim Order, the Interim Order as applicable, shall control in all respects.  All defined terms in this summary and description shall have the meaning proscribed to them in the Interim Order or in the Pre-Petition Agreements, as applicable.

because the Pre-Petition Credit Agreement was entered into outside of bankruptcy, many of the provisions of the Pre-Petition Credit Agreement are no longer applicable or impermissible due to the Bankruptcy Code.[6]   The Debtors and the Lender have mutually agreed to void those provisions.  The key provisions of the Post-Petition Financing are as follows:

| Borrowers: | VO Stone Holdings, Inc.; Victor Oolitic Stone Company. |
|---|---|
| **Lender:** | Indiana Commercial Finance, LLC. |
| **Loan Facility:** | |
| Facility Amount: | Three Million Five Hundred Thousand Dollars ($3,500,000). *See* Proposed Interim Order, Introductory Paragraph. |
| Budget: | A copy of the Budget is attached to the Interim Order as <u>Exhibit A</u>. |
| **Interest Rate:** | *LIBOR* + 5.5% |
| **Default Interest:** | Interest Rate + 3.0%.  (*See* Pre-Petition Credit Agreement § 4.2) |
| **Term:** | From the entry of the Interim Order until, and including, April 30, 2014.<br><br>The provisions of the Post-Petition Financing and Interim Order and any actions taken pursuant thereto shall survive entry of any order, including without limitation (a) confirming any plan of reorganization in any of these Chapter 11 Cases (and the Post-Petition Financing shall not be discharged by the entry of any such order or pursuant to Bankruptcy Code § 1141(d)(4)); (b) converting any of these Chapter 11 Cases to Chapter 7 cases; or (c) dismissing any of these Chapter 11 Cases, and the terms and provisions of the Interim Order as well as the Superpriority Claims, Liens and Replacement Liens granted pursuant to the Interim Order and the Pre-Petition Agreements shall continue in full force and effect notwithstanding the entry of such order, and such Superpriority Claims, Liens and Replacement Liens shall maintain their priority as provided by the Interim Order until all Pre-Petition Loan Indebtedness and all Post-Petition Indebtedness is indefeasibly paid in full and discharged.<br><br>(*See* Interim Order ¶¶14 and 23). |
| **Fees & Expenses:** | Without further order of this Court, and in consideration of other accommodations provided by the Lender, the Debtors shall reimburse the Lender for all reasonable out of pocket filing and recording fees, if any, reasonable attorneys' and paralegals' fees, the Lender's Consultants' (as defined in the Interim Order) reasonable fees, and costs and expenses and internal audit fees and expenses incurred by the Lender: (i) in the preparation and implementation of the Interim |

---

[6]   The mutually agreed invalidated portions of the Pre-Petition Agreements are:   Pre-Petition Credit Agreement: §2.1; Pre-Petition Credit Agreement: §2.2; Pre-Petition Credit Agreement: §2.4; Pre-Petition Credit Agreement: §5.1; Pre-Petition Credit Agreement: §5.2; Pre-Petition Credit Agreement §5.3; Pre-Petition Credit Agreement: §6.1; Pre-Petition Credit Agreement: §6.3;  Pre-Petition Credit Agreement: §6.4; Pre-Petition Credit Agreement: §7.5; Pre-Petition Credit Agreement: §§8.1-8.4; Pre-Petition Credit Agreement: §9.7; Pre-Petition Credit Agreement: §9.12; Pre-Petition Credit Agreement: §9.20; Pre-Petition Credit Agreement: §10.6; Pre-Petition Credit Agreement: §10.7; Pre-Petition Credit Agreement: §11.12; Pre-Petition Credit Agreement: §11.13; Pre-Petition Credit Agreement: §12.1.1.2; Pre-Petition Credit Agreement: §13.1.3; Pre-Petition Credit Agreement: §13.1.6; Pre-Petition Credit Agreement: §13.1.9; Fifth Amendment to the Pre-Petition Credit Agreement: §2.3; Fifth Amendment to the Pre-Petition Credit Agreement: §2.7; Fifth Amendment to the Pre-Petition Credit Agreement: §2.9; Sixth Amendment to the Pre-Petition Credit Agreement: §1.4; and Sixth Amendment to the Pre-Petition Credit Agreement: §1.7.

| | |
|---|---|
| | Order and the various Loans and other Post-Petition Financing, (ii) in the representation of the Lender in the proceedings, and (iii) as otherwise provided in the Pre-Petition Agreements. Subject to the Lender's discretion, the reimbursement contemplated hereby may be made by deducting such amounts from collections of the Lender or by adding such amounts to the Post-Petition Indebtedness.  Further, the Lender shall be paid a Post-Petition Financing fee of $100,000, which shall be earned immediately upon entry of the Interim Order but shall not be payable until the earlier of (a) the sale described in Paragraph 20 hereof or (b) the Termination Date, and shall constitute Post-Petition Indebtedness of the Debtors.<br><br>(*See* Interim Order, ¶¶18.) |
| **Collateral:** | Substantially all of the Debtors' assets (including without limitation all real, personal and fixture property of every kind and nature including without limitation all goods (including inventory, equipment and any accessions thereto) as extracted collateral, timber, instruments (including promissory notes), documents, accounts (including health-care insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities, including without limitation, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, tort claims, and all general intangibles including, without limitation, all payment intangibles, patents, patent applications (provided that no security interest shall be granted in United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law), trademarks, trademark applications, trade names, copyrights, copyright applications, software, engineering drawings, service marks, customer lists, goodwill, and all licenses, permits, agreements of any kind or nature pursuant to which Company possesses, uses or has authority to possess or use property (whether tangible or intangible) of others or others possess, use or have authority to possess or use (whether tangible or intangible) of Company, and all recorded data of any kind or nature, regardless of the medium of recording including, without limitation, all software, writings, plans, specifications and schematics, and the products and proceeds thereof, as more fully described in the Pre-Petition Agreements, which are incorporated herein by reference (collectively, including Cash Collateral (as defined below), the "Pre-Petition Collateral").<br><br>As security for the Post-Petition Indebtedness, the Lender shall have (effective upon the date of the Interim Order and without the necessity of the recordation of mortgages, security agreements, pledge agreements, financing statements or otherwise) valid and perfected senior security interests in, and liens on (collectively, the "Liens"), all assets of the Debtors of any nature whatsoever and wherever located, tangible or intangible, whether now or hereafter acquired, including without limitation, and any and all proceeds of the foregoing, a 100% pledge of any of the Debtors' capital stock in which any of the Debtors have an interest and the stock of all of the Debtors' subsidiaries, causes of action (including without limitation any commercial tort claims), any avoidance actions under Bankruptcy Code §§ 544, 545, 547, 548, 549, 550 or 553 and the proceeds thereof (provided, however, such lien on avoidance actions shall attach only upon entry of the Final Order and shall be limited to the amount of the Post-Petition Indebtedness except for claims and proceeds thereof under Bankruptcy Code § 549), investment property, leases and all substitutions thereto, accessions, rents and proceeds of the foregoing, wherever located, including insurance and other proceeds (collectively, with all proceeds and products of any or all of the foregoing and including the Pre-Petition Collateral, the "Collateral"):<br><br>Pursuant to Bankruptcy Code § 364(c)(2), a first priority, perfected Lien upon all of the Debtors' right, title and interest in, to and under all Collateral that is not otherwise encumbered by a validly perfected security interest or lien senior to the Liens of the Lender on the Petition Date (the "Prior Permitted Liens"); b.)          Pursuant to Bankruptcy Code § 364(d)(1), a first |

<table>
<tr><td></td><td>priority, senior perfected Lien upon all of the Debtors' right, title and interest in, to and under the Pre-Petition Collateral, provided that such first priority senior Lien shall be subject and junior to the Prior Permitted Liens; and c.) Pursuant to Bankruptcy Code § 364(c)(3), a second priority, junior perfected Lien upon all of the Debtors' right, title and interest in, to and under all other Collateral that is subject to Prior Permitted Liens to the extent such perfection in respect of a Pre-Petition Date claim is expressly permitted under the Bankruptcy Code. (Clauses (a), (b) and (c), collectively, the "Collateral.").<br><br>Except to the extent expressly set forth in clauses (a), (b) and (c) of the above paragraph or Paragraph 6 on the Interim Order, the Liens granted pursuant to the Interim Order and the Pre-Petition Agreements to the Lender to secure the Post-Petition Indebtedness shall not be subordinated to or made *pari passu* with any other lien or security interest. The provisions of any intercreditor agreements or subordination agreements that subordinate liens and security interests to the liens and security interests of the Lender or other indentures that subordinate any claims to the claims of the Lender shall remain in full force and effect and shall continue with respect to the liens and security interests granted to the Lender in the Collateral.<br><br>(*See* Interim Order ¶¶ E and 5).</td></tr>
</table>

| **Use of Proceeds:** | The Debtors shall be authorized to use the proceeds of the Post-Petition Indebtedness and the Collateral only for payment of such items as are set forth in the Budget and subject to the terms and conditions set forth in the Pre-Petition Agreements and the Interim Order. The Budget shall be revised by the end of each month during the period of the Interim Order, and shall remain subject to the consent of the Lender each month.<br><br>(*See* Interim Order ¶ 11.) |
|---|---|
| **Loan Documentation:** | The definitive Loan Documentation shall be the Interim Order and the Pre-Petition Agreements until the entry of the Final Order. Upon the entry of the Final Order, the Final Order and Pre-Petition Agreements shall be the definitive Loan Documentation. In the event that the Pre-Petition Agreements contradict the Interim or Final Order, the Interim or Final Orders controls. In the event that it is determined that any provision of the Pre-Petition Agreements violates the Bankruptcy Code, such provision shall be void. |
| **Covenants:** [7] | Not later than the second (2nd) business day of each week commencing with the second week of the period covered by the Budget, the Debtors shall provide the Lender with a variance report reflecting, on a line-item basis, the actual cash disbursements and revenues for the preceding week and the percentage variance (the "Variance Percent") of such actual disbursements and revenues from those reflected in the Budget for that period. Revenues less than ninety percent (90%) of the budgeted amount for (a) the first two-week period of the Budget, (b) the first three-week period of the Budget, or (c) any consecutive four-week period of the Budget ("Allowed Revenue Variance") shall constitute an Event of Default in accordance with the provisions of the Interim Order. For the avoidance of doubt, any amount included in the Budget that is not incurred or paid during a particular week shall be permitted to be carried over into subsequent weeks of the Budget.<br><br>a)    The Debtors shall continue their pre-petition cash management system with the Lender pursuant to a cash management order requested to be entered at the first day hearing, in form and substance reasonably acceptable to the Lender.<br>b)    All cash, checks, notes, drafts, instruments, acceptances and other property in the nature of items of payment representing proceeds of property and interests in property of the Debtors (collectively, "Cash Proceeds") currently in the possession of the Debtors or in |

---

[7]    In addition to the above-referenced bankruptcy covenants, section 11 of the Pre-Petition Credit Agreement contains numerous other covenants.

|  | |
|---|---|
|  | any accounts in financial institutions, depository accounts, shall be deemed proceeds of the Collateral unless such proceeds are specifically identified as not being proceeds of Collateral.  All Cash Proceeds in excess of budgeted collections shall be remitted to the Lender in accordance with the terms of the Interim Order and subject to Paragraph 10 thereof.<br><br>c)     The Debtors are hereby required to deliver to the Lender such other financial and other information concerning the business and affairs of the Debtors as the Lender shall reasonably request from time to time, including, without limitation, the financial reports and information provided to the Lender under the Pre-Petition Agreements, provided however that the Debtors reserve their right to claim that any such documents are protected under attorney-client privilege to the extent permitted under applicable law.  The Debtors shall cooperate with and permit the Lender to perform physical inventories of all assets in the Debtors' facilities at any reasonable times requested by the Lender.  The Debtors shall respond to the Lender's reasonable request for detailed information as to the extent and composition of the Collateral and any collections thereon.<br><br>(*See* Interim Order, ¶¶ 11, 13 and 19.) |
| **Releases** | Subject to the Final Order, in consideration for the Post-Petition Financing, the Debtors on behalf of themselves and their successors and assigns (collectively, the "Releasors"), shall forever release, discharge and acquit the Lender and its officers, directors, employees, agents, attorneys and predecessors in interest (collectively, the "Releasees") of and from any and all claims, demands, damages, liabilities, responsibilities, disputes, remedies, actions, causes of action, indebtedness and obligations, of every type, including, without limitation, any so called "lender liability" claims or defenses, which arose on or prior to the date the Interim Order is entered with respect to the Debtors, the Pre-Petition Loan Indebtedness, the Collateral, the Pre-Petition Agreements, the Post-Petition Indebtedness or the Post-Petition Financing.<br><br>(*See* Interim Order, ¶ 25.) |
| **Parties Bound:** | Subject to the Final Order, the findings contained in recital paragraphs of the Interim Order Order and the releases granted in Paragraph 25 of the Interim Order shall be binding upon all parties in interest, including without limitation, the Debtors and any statutory committees appointed in these Chapter 11 Cases, unless a party in interest has properly filed an adversary proceeding or commenced a contested matter (subject to the limitations set forth in Paragraph 6) challenging the amount, validity, enforceability, perfection or priority of the Pre-Petition Loan Indebtedness or the Lender's liens on the Pre-Petition Collateral in respect thereof, no later than a date that is seventy-two (72) days after the Petition Date, and the Court subsequently enters a judgment in favor of the plaintiff in any such timely and properly filed adversary proceeding or contested matter.  If no such adversary proceeding or contested matter is properly commenced as of such respective date, the Pre-Petition Loan Indebtedness shall constitute an allowed fully secured claim, not subject to subordination and otherwise unavoidable respectively.  Subject only to the rights set forth in this paragraph, for all purposes in these Chapter 11 Cases and any subsequent Chapter 7 cases, the Lender's liens on the Pre-Petition Collateral shall be deemed legal, valid, binding, perfected, not subject to defense, counterclaim, offset of any kind, subordination and otherwise unavoidable, and the Lender, the Pre-Petition Loan Indebtedness and the Lender's liens on the Pre-Petition Collateral shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including without, limitation, any successor thereto.  If any such adversary proceeding or contested matter is properly commenced as of such date, the findings contained in the recital paragraphs of the Interim Order shall nonetheless remain binding on all parties in interest except to the extent that such findings were expressly challenged in such adversary proceeding or contested matter, and all claims other than those claims raised in such challenge shall be subject to the release contained in Paragraph 25 of the Interim Order.  If such adversary proceeding or contested matter is dismissed or adjudicated in favor of the Lender, the findings and releases contained herein shall be effective.<br><br>The provisions of the Interim Order shall be binding upon and inure to the benefit of the |

| | |
|---|---|
| | Lender and its successors and assigns, and the Debtors, and their successors and assigns, including any trustee or other fiduciary hereafter appointed in these Chapter 11 Cases as a legal representative of the Debtors or the Debtors' estates.<br><br>(*See* Interim Order, ¶ 26.) |
| **Credit Bidding** | The Lender shall have the right to "credit bid" the amount of the Pre-Petition Loan Indebtedness and the Post-Petition Indebtedness as of the date of such bid during any sale of all or substantially all of the Debtors' assets to the extent it includes the sale of any Collateral, including without limitation, sales occurring pursuant to Bankruptcy Code § 363 or included as part of any restructuring plan subject to confirmation under Bankruptcy Code § 1129(b)(2)(A)(iii).<br><br>(*See* Interim Order, ¶ 28.) |
| **Events of Default**: | a)      The entry of an order dismissing any of these Chapter 11 Cases or converting any of these Chapter 11 Cases to Chapter 7 cases.<br>b)      The entry of an order appointing a Chapter 11 trustee in any of these Chapter 11 Cases.<br>c)      The entry of an order granting any other claim superpriority status or a lien (other than a Prior Permitted Lien) equal or superior to the liens granted to the Lender (except pursuant to an order under Bankruptcy Code § 506(c)).<br>d)      The entry of an order staying, reversing, vacating or otherwise modifying the Post-Petition Financing under the Interim Order (except as modified in a final order acceptable to Lender) without the Lender's prior written consent.<br>e)      The entry of an order in any of these Chapter 11 Cases appointing an examiner having enlarged powers beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4).<br>f)      An Event of Default or Default under the Pre-Petition Agreements other than an existing default or one related to any financial covenants or to the filing of these cases or the consequences thereof.<br>g)      Any material representation or material warranty by the Debtors to the Lender that is incorrect or misleading in any material respect when made.<br>h)      A change in the orderly sale of the Debtors' business and assets as a going concern or a change of control shall occur other than pursuant to a plan of reorganization or sale.<br>i)      The entry of any order granting any relief from the automatic stay, in an amount in excess of $50,000 so as to allow a third party to proceed against any material asset or assets of the Debtors, other than relating to assets subject to Prior Permitted Liens which if granted will not materially or adversely affect current operations.<br>j)      The entry of the Final Order shall not have occurred within thirty (30) days after the Petition Date.<br>k)      The commencement by the Debtors of other actions adverse to the Lender or its rights and remedies under the Interim Order, the Final Order approving the Motion, or any other Bankruptcy Court order.<br>l)      The failure to pay in full the Post-Petition Indebtedness by the last day of the Term.<br>m)      The Allowed Revenue Variance or the Allowed Disbursement Variance as set forth in Paragraph 11 of the Interim Order, is exceeded.<br>n)      The failure to meet any of the 363 Sale Benchmarks (as defined in ¶20 of the Interim order).<br><br>(*See* Interim Order ¶ 16.) |
| **Remedies upon the Occurrence of an Event of Default** | If a Default or an Event of Default (as defined in the Pre-Petition Agreements or in the Interim Order) occurs, the Lender shall have the right to immediately suspend funding under Post-Petition Financing and upon the Lender's providing five (5) business days written notice to the Debtors, the Office of the United States Trustee, and any statutory committees appointed in these Chapter 11 Cases ("Default Notice"), the Lender may terminate the Post-Petition Financing facility (the date of any such termination, the "Termination Date") and declare the Loans to be immediately due and payable, and the automatic stay pursuant to Bankruptcy Code § 362(a) shall be deemed lifted and modified, without further order of this Court, to permit the |

| | |
|---|---|
| | Lender to exercise any and all of its rights and remedies under the Pre-Petition Agreements and the Interim Order; provided, however, that the obligations and rights of the Lender and the Debtors with respect to all transactions which have occurred prior to the Termination Date shall remain unimpaired and unaffected by any such termination and shall survive such termination (including the Carve-Out); provided, further, that the obligation of the Lender to fund accrued unfunded payroll shall also remain unimpaired and unaffected by any such termination and shall survive such termination; and provided further that upon such termination the Lender shall be deemed to have retained all of its rights and remedies, including, without limitation, as provided in the Pre-Petition Agreements and under the Bankruptcy Code. The Debtors' right to use Cash Collateral shall terminate automatically on the Termination Date; provided however that subsequent to the issuance of the Default Notice the Debtors may seek entry of an Order after notice and hearing allowing use of Cash Collateral and prohibiting the Lender from taking the actions contemplated in this paragraph. <br><br> Upon the occurrence of a Default or an Event of Default, the Lender may exercise its rights and remedies and take all or any of the following actions without further modification of the automatic stay pursuant to Bankruptcy Code § 362 which is hereby deemed modified and vacated to the extent necessary to permit such exercise of rights and remedies and the taking of such actions and without further order of or application to this Court: (a) suspend all Post-Petition Financing and loans to the Debtors, and enjoin and prohibit the Debtors from using Cash Collateral to the extent that such Default or Event of Default would permit such relief under the Pre-Petition Agreements, as amended hereby; (b) suspend amounts in any accounts maintained with the Lender, or otherwise enforce rights against all or part of any Collateral in the possession of the Lender to the extent that such Default or Event of Default would permit such relief under the Pre-Petition Agreements, as amended hereby; and/or (c) subject to the provisions of Paragraph 15 of the Interim Order, take any other action or exercise any other right or remedy of the Lender under the Pre-Petition Agreements, the Interims Order or by operation of law. Upon the Debtors' receipt of a Default Notice, they shall immediately cease making any disbursements except those already accrued in accordance with the Budget, subject to further order of the Court after notice and a hearing. To the extent of any inconsistencies between the provisions of this Paragraph 17 and Paragraph 15 of the Interim Order, the provisions of the Interim Order shall control. <br><br> (*See* Interim Order, ¶¶ 15 and 17.) |
| **Miscellaneous** | Subject to and conditioned upon entry of a Final Order, in no event shall the Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any Collateral. <br><br> The Lender shall not be required to file a Proof of Claim in these Chapter 11 Cases. <br><br> The Debtors are authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements in addition to the Pre-Petition Agreements, as the Lender may reasonably require, as evidence of and for the protection of the Post-Petition Financing, or which otherwise may be deemed reasonably necessary by the Lender to effectuate the terms and conditions of the Interim Order and the Pre-Petition Agreements. <br><br> (*See* Interim Order, ¶¶29-31.) |
| **Use of Proceeds Received By Lender:** | Except as provided in a Final Order and without prejudice to the rights of any other party (but subject to the limitations thereon described below in Paragraph 26), proceeds or payments received by the Lender with respect to the Collateral upon which the Lender had security interests or liens shall be applied as follows: a.) first, to the payment of all reasonable costs, fees and expenses, including attorneys' fees of the Lender; b.) second, to the payment of Pre-Petition Loan Indebtedness consisting of accrued and accruing interest; c.) third, to the payment of Pre-Petition Loan Indebtedness consisting of principal; d.) fourth, to the payment of Post-Petition Indebtedness including all accrued and accruing interest, costs and expenses, including reasonable attorneys' fees; and e.) fifth, to the payment of the Post-Petition |

| | Indebtedness consisting of principal. |
| | (*See* Interim Order, ¶ 10.) |

48.    Therefore, the Debtors seek final and interim orders:

(i)    authorizing the Debtors to obtain secured post-petition financing (the "Post-Petition Financing") up to an aggregate principal amount not to exceed $3,500,000 from Indiana Commercial Finance, LLC (the "Lender");

(ii) granting the Lender, pursuant to Bankruptcy Code § 364(c) and (d), security interests in all of the Debtors' presently owned and after-acquired personal and real property and Pre-Petition Collateral (as defined below);

(iii) granting the Lender, pursuant to Bankruptcy Code § 364(c)(1), priority in payment with respect to such obligations over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than in respect of the Carve-Out (as defined below);

(iv) authorizing the Debtors, pursuant to Bankruptcy Code § 363(c), to use Cash Collateral (as defined below) and, pursuant to Bankruptcy Code §§ 361, 363(e) and 364(d), to provide adequate protection to the Lender with respect to any diminution in the value of the Lender's interest in the Pre-Petition Collateral (as defined below) resulting from the priming liens and security interests to be granted herein pursuant to Bankruptcy Code § 364(d) to secure the Post-Petition Financing, the use of Cash Collateral, the use, sale or lease of the Pre-Petition Collateral (other than Cash Collateral) and the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a);

(v) scheduling a preliminary hearing (the "Preliminary Hearing") on the Motion to consider entry of an interim order pursuant to Bankruptcy Rule 4001; and

(vi) scheduling a final hearing (the "Final Hearing") and establishing notice procedures in respect of the Final Hearing to consider entry of a final order (the "Final Order") authorizing on a final basis, inter alia, the Post-Petition Financing and the use of Cash Collateral.

3.      **The Debtors Were Unable to Obtain Necessary Post-Petition Financing on an Unsecured Basis under 11 U.S.C. § 364(a) or (b)**

49.      The Debtors could not have obtained a working capital facility of the type and magnitude required in these cases on an unsecured basis.

50.      Other than the proposed Post-Petition Financing, there are no viable financing alternatives available to the Debtors under the circumstances.  The Debtors have been exploring financial alternatives for at least six months and are intimately familiar with the lack of financing available to them.  For a number of reasons, including the current state of the financial markets, the size of the financing required, the nature and state of the Debtors' business operations, the immediacy of the Debtors' financing needs, and the liens of the Lender on the Pre-Petition Collateral, the Debtors are convinced that other than the proposed Post-Petition Financing they would be entirely unable to obtain financing to address the their urgent liquidity needs.

4.      **Approval of Priming Liens**

51.      As discussed above, the Debtors have explored financial alternatives and are aware of the lack of financing available to them.  In light of that, and given the state of the credit markets, the Debtors have concluded that financing comparable to that provided by the Lender under the Post-Petition Financing is currently unobtainable without priming the Lender's Pre-Petition liens.

52.      Thus, the Debtors are unable to obtain alternative Post-Petition financing through credit allowable on an unsecured basis and without granting priming liens.  It should be noted that the only liens that are being primed are the pre-petition liens of the Lender, who obviously consents to the priming of such liens as evidenced by the Lender's willingness to participate in the Post-Petition Financing.  In these circumstances, the Debtors, in the exercise of their considered business judgment and in consultation with their professional advisors, have

determined that the financing provided by the Post-Petition Financing is the most favorable under the circumstances and provides the Debtors necessary liquidity to maintain the going concern value of their business pending the conclusion of the Debtors' proposed sale process.

53.     Moreover, as noted above, virtually all of the Debtors' assets are encumbered by liens and security interests granted to the Lender.  Thus, even if alternative debtor in possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the Lender, the results of which could not be predicted with certainty.  Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, immediately jeopardizing their chapter 11 cases at the outset.

### 5.     The Loans Under the Post-Petition Financing are Necessary to Preserve Assets of the Debtors' Estates

54.     It cannot reasonably be disputed that the Debtors have an immediate need for access to a working capital facility.  As with most businesses of the Debtors' size, the Debtors have significant cash needs.  Access to substantial credit to purchase inventory, pay employees and to keep their businesses running is critical to the Debtors' survival.  In the absence of immediate access to cash and credit, the Debtors' suppliers and employees may refuse to supply the inventory and services required to maintain operations.

55.     The Post-Petition Financing is also essential so that the Debtors can immediately instill their employees, suppliers and customers with confidence in the Debtors' ability to meet their obligations to these important stakeholders.  Absent such confidence, the Debtors will not have the resources or support necessary to maintain operations and preserve their value as a going concern.

56.     The success of these chapter 11 cases thus depends on the confidence of the Debtors' employees, vendors, and customers.  If the DIP Motion is denied or delayed, that confidence may be destroyed, and the success of these chapter 11 cases might be irreparably damaged.  In contrast, once the Post-Petition Financing is approved, the Debtors' ability to provide their employees, vendors, customers, and other important stakeholders with the necessary confidence will be assured.  The Debtors' need for access to the Post-Petition Financing is, therefore, immediate.

### 6.     Request for Use of Cash Collateral

57.     The Debtors will require the ability to use cash and the proceeds of existing accounts receivable and inventory to maintain the operation of their businesses and preserve their value as going concerns.  These essential items, however, constitute part of the Lender's Cash Collateral and, therefore, may not be used in support of the Debtors' ongoing business activities absent compliance with section 363(c)(2) of the Bankruptcy Code.

### 7.     Approval of Adequate Protection

### (a)     Lender's Adequate Protection

58.     The Debtors propose to provide the Lender with adequate protection in accordance with sections 361, 363, and 364 of the Bankruptcy Code.  To that end, the Debtors, and the Lender have negotiated, and the Debtors request the Court approve, as of the Petition Date, certain protections of the Lender's interest in the Pre-Petition Collateral from any Diminution in Value of each of its respective interests in the Pre-Petition Collateral.  Such adequate protection, as described more fully in the Interim Order, is summarized below.

> (i)     the Lender shall be granted (effective upon the date of the Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or otherwise), valid and perfected, replacement security interests in, and liens on (the "Replacement Liens"), all of the Debtors' right, title and interest

in, to and under the Collateral, subject only to (x) the Carve-Out, (y) the Liens granted pursuant to this Order and the Pre-Petition Agreements to the Lender to secure the Post-Petition Indebtedness and (z) any Prior Permitted Liens (after giving effect to this Order) prior in interest and senior to the Liens granted to the Lender pursuant to this Order and the Pre-Petition Agreements; and

(ii)     the Lender shall be granted, pursuant to Bankruptcy Code § 364(c)(1), Superpriority Claims, junior only to (x) the Superpriority Claims granted pursuant to this Order to the Lender in respect of the Post-Petition Financing and (y) the Carve-Out.

59.     By the terms of the Post-Petition Financing, the Lender requires that, except as set forth in Paragraphs 5 and 6 of the Interim Order:

the Liens and Replacement Liens shall be prior and senior to all liens and encumbrances (other than Prior Permitted Liens) of all other secured creditors in and to such Collateral granted, or arising, after the Petition Date (including, without limitation, liens and security interests, if any, granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors). The Liens and Replacement Liens granted pursuant to this Order shall constitute valid and duly perfected security interests and liens, and the Lender shall not be required to file or serve financing statements, notices of lien or similar instruments in respect of the Pre-Petition Loan Indebtedness which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the Liens or Replacement Liens shall in no way affect the validity, perfection or priority of such Liens or Replacement Liens. If, however, the Lender at its sole discretion shall determine to file any such financing statements, notices of lien or similar instruments, or to otherwise confirm perfection of such Liens or Replacement Liens, the Debtors are directed to cooperate with and assist in such process, the stay imposed by Bankruptcy Code § 362(a) is hereby lifted to allow the filing and recording of a certified copy of this Order or any such financing statements, notices of lien or similar instruments, and all such documents shall be deemed to have been filed or recorded at the time of and on the date of the Interim Order.

60.     The Debtors believe that the proposed adequate protection is fair and reasonable.

The Lender has agreed that the adequate protection summarized above and provided for in the

Interim Order is sufficient to allow the Debtors to use the Lender's Cash Collateral. Furthermore, the priming of the Pre-Petition Liens will enable the Debtors to obtain the Post-Petition Financing.  As a result, the Lender consents to such priming liens and is entitled to receive adequate protection of its interest in the Pre-Petition Collateral.

### 8.    Good Faith

61.    The Debtors submit that the terms and conditions of the Post-Petition Financing, and the fees paid and to be paid thereunder, are the best available to the Debtors under the circumstances.  As stated above, the Debtors and the Lender negotiated the terms and conditions of the Post-Petition Financing and the use of Cash Collateral in good faith and at arm's length. Moreover, the Debtors' decision to enter into the Post-Petition Financing was an exercise of the Debtors' prudent business judgment.  Therefore, the Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the Post-Petition Financing, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

**B.    Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(A), 363(B), 363(C), 541(B)(7), 541(D), 1107(A), and 1108 and Fed. R. Bankr P. 6003 and 6004 (I) Authorizing, but not Directing, the Debtors to Pay All Pre-Petition (A) Wages, Salaries, Vacation and Other Accrued Compensation, as Well as All Withholdings and Deductions Related Thereto and (B) Contributions to and Benefits under Employee Medical and Similar Benefit Plans; (II) Authorizing, but not Directing, the Debtors to Continue Post-Petition the Maintenance of Any and All Employee Benefits, Policies, and Procedures in the Ordinary Course in Accordance with Pre-Petition Practices; (III) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor and Pay All Checks Presented for Payment and Electronic Payment Requests Relating to the Foregoing;  and (IV)Granting Related Relief (the "Employee Obligation Motion").**

### 1.    The Debtors' Employees

62.    As of the Petition Date, the Debtor Victor Oolitic Stone Company ("VOSC") employed approximately 137 active employees (the "Employees") for the performance of

services in connection with their operations. For the purposes of the Employee Obligation Motion, the Employees are subdivided into four groups: (i) the Hourly Union Employees; (ii) the Union Salaried Employees; (iii) the Non-Union Hourly Employees; and (iv) the Non-Union Salaried Employees. As of the Petition Date, the Debtor VO Stone Holdings, Inc. did not have any employees.

63.     As of the Petition Date, the Employees consist of: (i) approximately 73 Hourly Union Employees; (ii) one Union Salaried Employee; (iii) approximately 39 Non-Union Hourly Employees; and (iv) approximately 24 Non-Union Salaried Employees.

64.     The Debtors' weekly gross payroll is approximately $105,734.89.

65.     As of the Petition Date, no Employee has accrued more than the section 507(a)(4) maximum of $12,475 in combined Pre-Petition Wages, Vacation and Employee Benefits (as those terms are defined below).

## 2.     Pre-Petition Employee Claims

66.     As described more fully below, the Debtors owe certain of the Employees monies on account of wages, salaries, vacation, commissions, ordinary course incentive payments, and other accrued compensation that were earned during or related to a period prior to the Petition Date, but that are scheduled to be paid Post-Petition. Attendant to these payments, the Debtors owe employer taxes and withholding taxes to local, state and federal authorities. In addition, the Debtors withhold certain amounts from some of the Employees' paychecks for contributions to various programs and funds, including, without limitation, a 401(k) plan, certain defined benefit plans, medical and dental plans, child support and garnishments. All of the foregoing Pre-

Petition employee claims are collectively referred to hereinafter as the "Pre-Petition Employee Claims."[8]

67.     Failure to pay the Pre-Petition Employee Claims would severely undermine the Employees' morale and result in significant hardship to the Employees.  To retain the services of the Employees and maintain their morale and loyalty during these chapter 11 cases, the Debtors seek authority to satisfy the Pre-Petition Employee Claims, subject to the terms and conditions set forth in any order authorizing secured post-petition financing and to the extent such payments are provided for in a budget approved by the Debtors' post-petition lender.  As of the Petition Date, the Debtors estimate that the aggregate amount of the Pre-Petition Employee Claims is approximately $508,304.00.  The Debtors request authorization, but not direction, to pay any Pre-Petition Employee Claims up to the $12,475 per Employee limit provided for by section 507(a)(4) of the Bankruptcy Code.

**(b)     Pre-Petition Wages and Salaries**

*(i)     Hourly Union Employees*

68.     The Hourly Union Employees are members of one of three unions (but are subject to one of four collective bargaining agreements): (i) the International Association of Machinists, District #90, Lodge # 2918, affiliated with the American Federation of Labor and Congress of Industrial Organization (the "Machinists' Union"); (ii) the Laborers' International Union of North America Local Union #741 (the "Laborers' Union"); and (iii) the International Brotherhood of Carpenters and Joiners of America, Carpenters' Industrial Council, Local #8093[9]

---

[8]     Any descriptions of Pre-Petition Employee Claims in the Employee Obligations Motion are intended as summaries only.  To the extent there are any inconsistencies between the summary descriptions of Pre-Petition Employee Claims contained herein and the terms and conditions of any documentation governing such programs, the terms of such documentation shall control.

[9]     Previously, certain members of the Carpenters' Union were members of the Journeyman Stonecutters Association of Indiana (the "Stonecutters' Union").  The Stonecutters' Union and the Carpenters' Union

(the "Carpenters' Union" and collectively with the Machinists' Union, and the Laborers' Union, the "Unions"). Each Union has its own collective bargaining agreement.[10] In most instances, these agreements are identical or nearly identical. However, in some important instances the Unions have negotiated for materially different rights. In order to maximize judicial economy, this Declaration will only distinguish between the Unions when necessary for the specific relief requested.

69.    The Hourly Union Employees are paid weekly, one week in arrears. The Hourly Union Employees' work week is Monday through Sunday. The Hourly Union Employees were last paid Thursday, February 13, 2014, before the Debtors filed for protection under Chapter 11 of the Bankruptcy Code. The Hourly Union Employees' next paychecks will be due Friday, February 21, 2014. As of the Petition Date, the Debtors owe the Hourly Union Employees approximately $37,668.74 in Pre-Petition wages.

*(ii)    Union Salaried Employees*

70.    The collective bargaining agreement between the Debtors and the Laborers' Union creates a salaried position. The Union Salaried Employee is paid in the same manner as the Hourly Union Employees. The Union Salaried Employee was last paid Thursday, February 13, 2014, before the Debtors filed for protection under Chapter 11 of the Bankruptcy Code. As of the Petition Date, the Debtors owe the Union Salaried Employee approximately $1,576.92 in Pre-Petition wages.

---

have merged. However, the former members of the Stonecutters' Union are still subject to their old collective bargaining agreement, and will therefore be discussed separately if necessary.

[10]    Nothing in the Motion or in the Proposed Order is intended or should be construed as (a) an admission as to the validity or priority of any claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any claim, including the validity or priority thereof, or (c) an approval or assumption of any agreement, contract or lease whether under section 365(a) of the Bankruptcy Code or otherwise. Likewise, any payment made pursuant to the Employee Obligations Motion or the Proposed Order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### (iii)    Hourly Non-Union Employees

71.    The Debtors' approximately 39 Non-Union Hourly Employees are paid on a weekly basis, one week in arrears. The Hourly Non-Union Employees were last paid Thursday, February 13, 2014, before the Debtors filed for protection under Chapter 11 of the Bankruptcy Code. The Non-Union Hourly Employees' next paychecks will be due Friday, February 21, 2014. As of the Petition Date, the Debtors owe the Non-Union Hourly Employees approximately $34,392.97 in Pre-Petition wages.

### (iv)    Non-Union Salaried Employees

72.    The Debtors' approximately 24 Non-Union Salaried Employees are paid on a weekly basis, one week in arrears. The Non-Union Salaried Employees were last paid Thursday, February 13, 2014, before the Debtors filed for protection under Chapter 11 of the Bankruptcy Code. The Non-Union Salaried Employees' next paychecks will be due Friday, February 21, 2014. As of the Petition Date, the Debtors owe the Non-Union Salaried Employees approximately $36,604.40 in Pre-Petition wages.

73.    Based on the Debtors' ordinary course payroll schedule, the aggregate amount of current earned, but unpaid, Pre-Petition wages and salaries, for all four categories of Employees, inclusive of withholding for payroll taxes (the "Pre-Petition Wages and Salaries") is approximately $110,244.03 as of the Petition Date.

### (c)    Pre-Petition Payroll Taxes

74.    Attendant to the payment of Employee wages and salaries is the Debtors' obligation to pay local, state and federal withholding taxes and employer taxes. The Debtors withhold the withholding taxes and Social Security and Medicare contributions from payroll and pay these amounts to the appropriate authorities on a weekly, quarterly or annual basis, as applicable. The aggregate amount of Pre-Petition withholding taxes, tax deposits and processing

fees inclusive of both the Debtors' portion and the employee portion, shall be referred to as the "Pre-Petition Payroll Taxes." Weekly payroll taxes payments are approximately $26,190.75. Although there are no amounts presently due for Pre-Petition Payroll Taxes, the Debtors estimate that as of the Petition Date, the Pre-Petition Payroll Taxes not yet due but related to the Pre-Petition period, are $26,190.75.

75.    The Debtors also pay federal, state, and local unemployment taxes and contributions ("Unemployment Taxes" together with the Pre-Petition Payroll Taxes, the "Pre-Petition Tax Claims"). The next payments to the federal and state unemployment taxing authorities ("FUTA" and "SUTA" respectively) are due on April 30, 2014. The estimated amount of Unemployment Taxes accrued on the Petition Date is $65,500 ($4,500 FUTA and $61,000 SUTA). The total payment due on April 30, 2014 is estimated at $127,000 ($7,000 for FUTA and $120,000 SUTA.)

### (d)    Designated Withholdings

76.    The Debtors withhold money from the Employee payroll pursuant to certain Employees' instructions or orders by judicial or administrative authorities (collectively, the "Designated Withholdings") for contributions or remittance to various programs and funds including, without limitation, certain supplemental insurance programs, savings plans, donations, child support, garnishments, and for other purposes. Failure to remit these funds to the appropriate programs or funds will be regarded by the Employees as a misappropriation of their wages or salaries and the cessation of certain benefits to which they reasonably believe they are entitled as a result of the deductions.

**(e)** **Vacation and Personal Time**

*(i)* ***Union Employees***

77.     Each of the Unions have negotiated different systems for the allowance of vacation and personal time.

(A)     Machinists' Union

78.     The Employees who are members of the Machinists' Union are entitled to some amount of vacation time ("Vacation").  If any Machinists' Union Employee has unused Vacation at the end of the year, the Employee is entitled to receive such payment due to him for the unused hourly pay.  In terms of calculating unused Vacation, the year begins on May 1.  The amount of Vacation a Machinists' Union Employee is entitled to is based on the Employee's seniority.  The amount of Vacation ranges from 1 hour for each 40 hours worked, not to exceed 40 hours of pay for Employees with less than one year of seniority, to 80 hours of Vacation, plus five additional days, plus a thirty percent Vacation Bonus for Employees with thirty years of seniority who work at least 1600 hours in a given year.  Based on the Debtors' estimates, approximately $6,808.14 of Pre-Petition Vacation has accrued to the Machinists' Union Employees.

*(B)*     *Laborers' Union*

79.     The Employees who are members of the Laborers' Union are entitled to some amount of Vacation after six months of employment.  After six months of employment, the amount of Vacation earned will retroactively include the first six months of an Employee's tenure.  If any Laborers' Union Employee has unused Vacation at the end of the year, the Employee is entitled to receive such payment due to him for the unused hourly pay.  In terms of calculating unused Vacation, the year begins on May 1.  The amount of Vacation a Laborers'

Union Employee is entitled to is based on the Employee's seniority.  The amount of Vacation ranges from 1 hour for each 32 hours worked, not to exceed 40 hours of pay for Employees with less than one year of seniority, to 80 hours of Vacation, plus a twenty-five percent Vacation Bonus for Employees with thirty years of seniority who work at least 1280 hours.  Based on the Debtors' estimates, approximately $14,955.85 of Pre-Petition Vacation has accrued to the Laborers' Union Employees.

### (C)     Stonecutters' Union

80.     The Employees who were members of the Stonecutters' Union are entitled to some amount of Vacation after six months of employment.  After six months of employment, the amount of Vacation earned will retroactively include the first six months of an Employee's tenure.  If any Stonecutters' Union Employee has unused Vacation at the end of the year, the Employee is entitled to receive such payment due to him for the unused hourly pay.  In terms of calculating unused vacation, the year begins on May 1.  The amount of Vacation a Stonecutters' Union Employee is entitled to is based on the Employee's seniority.  The amount of Vacation ranges from 1 hour for each 40 hours worked, not to exceed 40 hours of pay for Employees with less than one year of seniority, to 80 hours of Vacation, plus five Vacation days, plus a thirty percent Vacation Bonus for Employees with thirty years of seniority who work at least 1600 hours.  Based on the Debtors' estimates, approximately $31,728.40 of Pre-Petition Vacation has accrued to the Machinists' Union employees.

### (D)     Carpenters' Union

81.     The Employees who are members of the Carpenters' Union are entitled to some amount of Vacation after six months of employment.  If any Carpenters' Union Employee has unused Vacation at the end of the year, the Employee is entitled to receive such payment due to

him for the unused hourly pay.  In terms of calculating unused vacation, the year begins on May 1.  The amount of Vacation a Laborers' Union Employee is entitled to is based on the Employee's seniority.  At a minimum, for Employees with less than one year of seniority, who have not worked 1600 hours by April 30, Vacation is earned on a pro rata basis based on their start date and hours worked (based on a maximum amount of 1 hour for every 40 hours worked not to exceed 40 hours).  The maximum amount of Vacation provided is 80 hours, plus five additional days, plus a thirty percent Vacation Bonus for Employees with twenty five years of seniority who work at least 1600 hours.  Based on the Debtors' estimates, approximately $90,604.21 of Pre-Petition Vacation has accrued to the Carpenters' Union Employees.

82.    All Union Employees have until May 1, 2014 to use their Vacation, and if they do not, they will be owed a cash payment for their unused Vacation.  Through the Employee Obligation Motion, the Debtors ask that the Union Employees be allowed to continue accruing and using their Vacation.  If the Debtors are still in bankruptcy on June 1, 2014, they will independently move this Court for the authority to pay the Union Employees' unused vacation.

*(ii)    Non-Union Employees*

83.    Most Non-Union Employees accrue hours each week based on the number of vacation weeks for which they are eligible (e.g., an employee with three weeks of vacation will accrue 2.31 hours per week).  The total number of weeks earned is based on tenure with the Debtors except that several employees have additional Vacation based on employment negotiations.  Certain Non-Union Hourly Employees accrue Vacation days in a manner similar to the Union Employees with a June 1 through May 31 calendar.  The amount of Vacation earned by these Employees ranges from one hour for every forty hours worked, not to exceed 40 hours for Employees with less than one year of seniority to two hours for every forty hours worked, not

to exceed 80 hours, for Employees with five or more years of seniority.  As of the Petition Date, the Non-Union Employees have accrued $160,979.13 of Vacation.

84.     The Debtors estimate that as of the Petition Date the value of all Vacation accrued by Employees, but not yet used by the Employees (the "Pre-Petition Time Off Amount") is approximately $305,075.73.

85.     Employees are scheduled varying amounts of paid holidays ("Holidays") per year based on their designation.  Employees are scheduled for between eight and eleven Holidays per year.

86.     Any Employee that works over 40 hours a week is eligible for overtime pay ("Overtime").  The value of all Pre-Petition Overtime is included in the outstanding amount of the Pre-Petition Wages and Salaries owed.

87.     The Debtors believe honoring their obligations to the Employees with respect to Overtime and Vacation in accordance with the Debtors' policies and procedures is imperative to maintaining the morale and loyalty of the Employees during these chapter 11 cases.

### (f)    Reimbursable Employee Business Expenses

88.     Before the Petition Date, certain of the Employees regularly incurred business expenses, which, consistent with ordinary practice, are reimbursable by the Debtors (the "Reimbursable Expenses").  The Reimbursable Expenses include, without limitation, expenses for work-related travel (including a travel allowance for certain Non-Union Salary Employees), lodging, mileage, auto expense, telephone charges, tools, work boots and meals.  When an Employee has incurred a Reimbursable Expense, it is the Debtors' policy to require the Employee to submit an expense report within thirty (30) days of incurring the expense.  The Debtors generally reimburse an Employee within seven (7) business days of the receipt of a properly submitted expense report.  It would be inequitable to require the Employees to bear

these expenses, all of which were incurred on behalf of the Debtors with the expectation that they would be reimbursed promptly. As of the Petition Date, Reimbursable Expenses in the system, but not paid, total approximately $835.00; however, given the nature and timing of the process, the Debtors cannot precisely quantify the actual unpaid Pre-Petition Reimbursable Expenses. Over the last three (3) full calendar months preceding the Petition Date, Reimbursable Expenses have averaged approximately $1,293.49 (the "Pre-Petition Reimbursable Expenses").

89.     Finally, the Debtors have provided a limited group of Employees with credit cards to use for business expenses. While the cards bear the Employee's name, the statements are sent to and paid for by the Debtors. The Employee does not provide the credit card company with any money.

### 3. Employee Benefits

90.     Before the Petition Date, the Debtors offered their full-time Employees standard employee benefits funded by either the Debtors, the Employees or both, including, among others: a variety of employee benefit plans and policies, including medical and health insurance, group life insurance, short-term disability, supplemental, dental, vision, flexible spending plan, COBRA, 401(k) plans, workers' compensation programs, and other similar such benefits (collectively, the "Employee Benefits").[11] Failure to continue these Employee Benefits would severely undermine the Employees' morale and result in significant hardship to the Employees.

91.     As of the Petition Date, the Debtors were obligated to pay certain contributions to and benefits under the plans related to such Employee Benefits (collectively, the "Benefit Contributions"). Those Benefit Contributions either (a) were due and unpaid by the Debtors as

---

[11]     Any descriptions of Employee Benefits in the Employee Obligations Motion are intended as summaries only. To the extent there are any inconsistencies between the summary descriptions of Employee Benefits contained herein and the terms and conditions of any documentation governing such programs, the terms of such documentation shall control.

of the Petition Date, or (b) remained unpaid as of the Petition Date because certain Benefit Contributions accrued either in whole or in part prior to the commencement of these chapter 11 cases, but will not become payable in the ordinary course of the Debtors' business until a later date.  The Debtors estimate that the total of such Benefit Contributions as of the Petition Date is approximately $31,870 (the "Benefit Contribution Obligation"). The Debtors also seek authority to continue the Employee Benefits in the ordinary course of business during the Post-Petition period.

### (g)      Medical and Health Insurance

92.    The Debtors provide different medical insurance plans to their Employees based on their designation (the "Medical Plans").  Prior to the Petition Date, the Debtors paid for their February contributions to the various Medical Plans, thus there are no pre-petition amounts outstanding as of the Petition Date.  However, through the Employee Obligation Motion, the Debtors are requesting authority to continue providing their employees coverage under the Medical Plans as described below.

#### (i)      *Union Employees*

##### (A)      Carpenters' Union & Stonecutters' Union

93.    Under their respective collective bargaining agreements, the Debtors provide the Employees who are members of the Carpenters' Union (including those employees who were members of the Stonecutters' Union) with medical insurance through the United Brotherhood of Carpenters and Joiners of America Ohio Carpenters' Health Plan.  On average, the Debtors' contribution costs $52,784 per month.  The two applicable collective bargaining agreements require the Employees who are members of the Carpenters' Union and the Stonecutters' Union to contribute to their Medical Plan's under certain circumstances that have not occurred as of the Petition Date.

(B)    Laborers' Union

94.    Under the applicable collective bargaining agreement, the Debtors provide the Employees who are members of the Laborers' Union with medical insurance through the Indiana Laborers Fringe Benefits Funds.  On average, the Debtors' contribution costs $6,137 per month. The applicable collective bargaining agreement requires the Employees who are members of the Laborers' Union to contribute to their Medical Plans under certain circumstances that have not occurred as of the Petition Date.

(C)    Machinists' Union

95.    Under the applicable collective bargaining agreement, the Debtors provide the Employees who are members of the Machinists' Union with medical insurance through the Indiana Laborers Fringe Benefits Funds.  On average, the Debtors' contribution costs $3,387 per month.   The applicable collective bargaining agreement requires the Employees who are members of the Machinists' Union to contribute to their Medical Plans under certain circumstances that have not occurred as of the Petition Date.

(ii)    *Non-Union Employees*

96.    All of the Debtors' Non-Union Employees, except for certain Hourly Non-Union Employees, are provided with a Medical Plan from SIHO Insurance Services, which is a fully insured plan.  The Non-Union Employees may either choose a PPO plan—a Preferred Provided Organization Plan—or a HDHP plan—a High Deductible Health Plan.  Non-Union Employees who select a HDHP plan receive a quarterly contribution from the Debtors.  Additionally, an Employee who selects an HDHP plan can deduct certain amounts from their paycheck which will be deposited into a Health Savings Account—or HSA.  Prior to the Petition Date, the Debtors have not deposited two weeks of employee deductions into their HSA.  Additionally, the Debtors provide a quarterly contribution to their Employees' HSA.  The average quarterly

contribution the Debtors make to their Employees' HSA is approximately $14,000. All covered Non-Union Employees have a monthly premium deducted, pro-rata, from their weekly pay. On average, the Debtors' contributions to its Non-Union Employees' Medical Plans is $33,113 monthly.

97.    Non-Union Employees who are not eligible for a Medical Plan from SIHO Insurance Services are allowed to participate in a voluntary FSA—or Flexible Spending Account—plan. These Employees choose their participation levels annually, and the Debtors match the contribution up to $500 per year. On average, the Debtors' contributions to these FSA Plans are $2,313 a month.

**(h)    Supplemental Life Insurance, Dental, Vision, Accident and Critical Injury Insurance:  Flexible Spending Plan**

98.    All Non-Union Employees are also able to choose from a menu of additional health, dental, vision, life and dependent life coverage's (the "Voluntary Benefits") provided by the Voluntary Benefits Association. The Non-Union Employee pays 100% of the premium through weekly payroll deductions. There is no cost to the Debtors, but the Debtors collect the premiums from the Employees and remit the premiums to the insurers.

**(i)    COBRA**

99.    In the ordinary course of business, the Debtors pay certain costs associated with the provision of COBRA extended group health benefits insurance coverage to certain former Employees and their dependents (the "COBRA Coverage"). Under the COBRA Program, a former Employee may elect to receive COBRA Coverage for the continuance of the Medical Plans, Voluntary Benefit Plans, and Flexible Spending Plan. As of the Petition Date, there is approximately one former Employee using the COBRA Program.

100.    Pre-Petition unpaid costs associated with this obligation (the "Pre-Petition COBRA Obligations") are estimated by the Debtors to be *de minimis*.

### (j)    Short-Term Disability

101.    All of the Union Employees who belong to either the Carpenters' Union or the Stonecutters' Union receive short-term disability insurance, from Mutual of Omaha, with 100% of the premiums paid for by the Debtors.  On average, the Debtors pay $228.00 per month for this coverage.

### (k)    401(k) Contributions:

102.    The Non-Union Employees are eligible to participate in the Debtors' 401(k) Plan. A Non-Union Employee is eligible if the Employee is at least 18 years of age and has completed ninety days of service.  The Debtors' will match the Employee's contribution up to $500 per year.  On average, the Debtors' weekly contribution to the 401(k) Plan is $3,800 per month. Additionally, one Employee has taken a loan against her 401(k) and the Debtors withhold her repayments from her paycheck.  There is no cost to the Debtors in this transaction.

### (l)    Life Insurance

103.    The Debtors' provide life insurance for most of their Employees.  The Debtors pay 100% of the premiums.  The Non-Union Employees who work in the Debtors' main office receive a $50,000 policy at a cost of approximately $600 per month paid to SIHO on the same bill as the Medical Plans.  The Non-Union Employees who participate in the FSA are provided with $20,000 of coverage if not a supervisor and $50,000 if a supervisor.  Union Employees who are members of the Carpenters' Union or the Laborers' Union have a $10,000 life insurance policy as part of their respective Medical Plans.  Members of the Stonecutters' Union have a $10,000 life insurance policy as participants of the Carpenters medical plan but also have an additional $20,000 policy.  Members of the Machinists' Union are provided with the same

policies as the Stonecutters' Union.  The Non-Union Employees who participate in the FSA, the Stonecutters and the Machinists premiums all are paid by the Debtors on one bill to Mutual of Omaha, for which the cost is approximately $600 per month.

### (m)    Pension Plans

104.    Under their respective collective bargaining agreements, the Debtors contribute to certain Pension Plans on behalf of the Union Employees.  The Debtors contribute to the International Association of Machinists National Pension Fund ("IAM Plan") for Employees who are members of the Machinists', Stonecutters' and Carpenters' Unions.  On average, the Debtors contribute $22,783 per month to the IAM Plan.  The Debtors contribute to the Laborers International Union of North America (Industrial) Pension Plan (the "LIUNA Plan") on behalf of the Employees who are members of the Laborers' Union.  On average, the Debtors contribute $2,476 per month to the LIUNA Plan.

### (n)    Workers' Compensation

105.    The Debtors are required under the laws of the states in which they operate to maintain workers' compensation insurance that provides their Employees with coverage for injuries arising from or related to their employment with the Debtors.  The Debtors: (a) either maintain workers' compensation liability insurance or participate in state-administered workers' compensation programs in each of the states in which they do business; and (b) provide Employees with workers' compensation coverage for any eligible claims arising in any jurisdiction (collectively, (a) and (b) the "Workers' Compensation Program").

106.    To implement the Workers' Compensation Program the Debtors maintain fully-insured workers' compensation policies (the "Workers' Compensation Policies") with Brickstreet Mutual Insurance Company and Argonaut Insurance Company which collectively cover workers' compensation claims of the Debtors' Employees in two (2) states.  The Workers'

Compensation Policies provide full insurance coverage for workers' compensation claims.   The Debtors pay annual premiums of approximately $336,556 (in the aggregate) on account of the Workers' Compensation Policies.   The next payments totaling approximately $28,428 on the Worker's Compensation Policies are due on or around February 20, 2014.   Each of the Workers' Compensation Policies expires on December 31, 2014.

### (o)     Union Dues

107.   The Debtors' pay a portion of their Employees' union dues owed to the four Unions (the "Union Dues").   As of the Petition Date, the Debtors have accrued $1,383.52 in Union Dues.

### 4.     Relief Requested

108.   The Debtors seek the entry of an order authorizing, but not directing them, to pay or otherwise honor, as described more fully above, various Pre-Petition Employee Claims and Benefit Contributions and to continue during the Post-Petition period Employee Benefits (collectively with the Pre-Petition Employee Claims and Benefit Contributions, the "Employee Claims and Benefits") in effect immediately prior to the filing of these chapter 11 cases.[12]

109.   Specifically, the Debtors are seeking an order authorizing, but not directing them, to pay the Pre-Petition Employee Claims up to an aggregate amount not to exceed $525,000 including authority, but not direction, to pay: (a) the Pre-Petition Wages and Salaries; (b) the Pre-Petition Tax Claims; (c) the Pre-Petition Time Off Amount; and (d) the Reimbursable Employee Expenses.

110.   The Debtors also seek authorization, but not direction, to continue Post-Petition the maintenance of any and all employee benefits, policies and procedures in the ordinary course

---

[12]     Nothing herein shall be deemed to constitute an assumption of any executory contract, whether under section 365(a) of the Bankruptcy Code or otherwise.

in accordance with Pre-Petition practices (which continuation shall not be deemed an assumption of any executory contract, employee benefit, policy or procedure pursuant to section 365 of the Bankruptcy Code or otherwise).

111.    The Debtors also seek authorization, but not direction, to honor and continue to offer the Employee Benefit Programs, make any necessary contributions to such programs and pay any unpaid premium, claim or amount owed as of the Petition Date, up to an aggregate amount of $35,000 including, but not limited to, honoring all of the above listed Employee Benefits (which continuation shall not be deemed an assumption of any executory contract, employee benefit, policy or procedure pursuant to section 365 of the Bankruptcy Code or otherwise).

112.    The Debtors also seek confirmation that they are permitted to pay any and all Pre-Petition Tax Claims.

113.    The Debtors also seek confirmation that they are permitted to continue to withhold Designated Withholdings.

114.    Finally, the Debtors seek authorization for all banks to receive, process, honor and pay any and all checks drawn and direct deposits on the Debtors' payroll and general disbursement accounts with respect to payments described in the Employee Obligation Motion, whether presented before or after the Petition Date, upon receipt by each bank and financial institution of notice of such authorization, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

**C.** **Debtors' Motion for Order under Sections 105(A), 363(B), 507(A) and 541 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 Authorizing (I) Payment of Certain Pre-Petition Sales and Use Taxes and (II) All Banks and Other Financial Institutions to Honor All Related Checks and Other Fund Transfers (the "Tax Motion")**

115.    In the ordinary course of their business, the Debtors pay Taxes to various Taxing Authorities throughout the United States on a periodic basis.[13]    While the Debtors believe that they are substantially current with respect to their payment of Taxes the Debtors seek to make such payments where (a) Taxes accrued or incurred Pre-Petition were not paid Pre-Petition or were paid in an amount less than actually owed, including the Deficient Payments, (b) payments made Pre-Petition by the Debtors were lost or otherwise not received in full by any of the Taxing Authorities, or (c) Taxes incurred for Pre-Petition periods become due after the commencement of these chapter 11 cases.[14]    As of the Petition Date, the Debtors' outstanding obligations in respect of Taxes, including amounts incurred for Pre-Petition periods that will come due after the Petition Date, totaled approximately $494,024.83.

116.    Payment of the Taxes is necessary for the Debtors to remain in good standing and operate in the various jurisdictions in which they do business.  Certain Taxing Authorities either have not been paid due to the time during the month, quarter or year at which such Taxes are normally remitted, or may have been sent checks for Taxes that may or may not have been presented or cleared as of the Petition Date.  In some cases, obligations may have accrued or are accruing, or are subject to audit or review, but may have not yet become due and payable.

---

[13]    The Debtors do not, and should not be deemed by the Tax Motion to:  (a) admit to the validity or amount of any Taxes; (b) waive their right to dispute any Taxes on any ground, or to seek a determination as to the amount or legality of any Taxes pursuant to section 505 of the Bankruptcy Code; (c) promise to pay any Taxes; (d) request authorization to assume any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; or (e) waive their right to request further relief related to the Taxes in the future.

[14]    Taxing authorities may also assert claims for Taxes that accrued Pre-Petition which were not paid by the Debtors.  For the avoidance of doubt, by the Tax Motion, the Debtors do not admit any liability with respect to any Taxes, and reserve their rights to object to any claims raised by any taxing authority.

Accordingly, the Debtors seek authorization for their banks to honor Pre-Petition wire transfer requests and checks issued by the Debtors to the Taxing Authorities in payment of Pre-Petition Taxes as described herein that, as of the Petition Date, have not cleared or been transferred.  In addition, to the extent that the Debtors have not yet remitted payment to the Taxing Authorities with respect to certain Pre-Petition Taxes, the Debtors seek authorization to issue checks or provide for other means of payment to the Taxing Authorities to the extent necessary to pay such Taxes.

  **D. Debtors' Motion for an Order under Sections 105, 345, 363, 364, and 503(B) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004 and Local Rule 2015-2 Authorizing (I) Maintenance of Existing Bank Accounts; (II) Continued Use of Existing Cash Management System; (III) Continued Use of Existing Business Forms and Records; and (IV) Waiving the Requirements of Section 345(B) of the Bankruptcy Code on an Interim Basis; and (V) Related Relief (the "Cash Management Motion")**

  117. The basic structure of the cash management system (the "Cash Management System") described herein constitutes the Debtors' ordinary, usual, and essential business practices.  The Debtors' Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity.  Flowcharts generally outlining the Debtors' Cash Management System are attached to the Cash Management Motion as Exhibit B.

  118. Prior to the commencement of these Chapter 11 Cases, the Debtors maintained, in the ordinary course of business, four operational bank accounts (collectively, the "Bank Accounts") at three banking institutions (collectively, the "Cash Management Banks").  In particular, the Debtors maintain one Bank Account with JPMorgan Chase Bank, N.A. ("Chase National"), two Bank Accounts with Old National Bancorp ("Old National Bank"), and one Bank Account with BMO Harris Bank N.A. ("BMO").  A list of the Bank Accounts and redacted

account numbers is attached as <u>Exhibit A</u> to the Cash Management Motion.  The Debtors do not maintain any investment accounts.

119.    Under the Cash Management System, the Debtors collect and concentrate the funds generated by the Debtors' operations to fund disbursements to their vendors, suppliers, employees and other creditors incurred in the operation of the Debtors' businesses.  The Cash Management System uses a banking system provided by BMO, which is a general ledger system that tracks account balances and transfers.  The Debtors' finance and accounting employees use this system to accurately maintain and track the Debtors' cash and ensure payment of the Debtors' obligations.

120.    The movement of funds through the Cash Management System is described in detail below.

### 1.    <u>Cash Management Fees</u>

121.    In the ordinary course of business, the Debtors incur fees charged by the Cash Management Banks for administering the Bank Accounts and certain credit card processing fees (collectively, the "Cash Management Fees").  The administration of the Bank Accounts is a critical aspect of the Cash Management System, and any cessation of these services due to the Debtors' inability to pay the Cash Management Fees would be extremely disruptive to the Cash Management System and the Debtors' businesses overall.  As the Cash Management Fees are automatically debited from the Bank Accounts by the Cash Management Banks, if there were any outstanding Cash Management Fees on the Petition Date, the amount of such outstanding fees would be *de minimis*.  By the Cash Management Motion, the Debtors request authority from the Court to pay and honor Cash Management Fees incurred in the ordinary course of the Debtors' business.

122.    The Debtors maintain current and accurate accounting records of daily cash transactions and submit that maintenance of this Cash Management System will prevent undue disruption to the Debtors' business operations while protecting the Debtors' cash for the benefit of their estates.

123.    During the course of these Chapter 11 Cases and in accordance with the terms of any order approving the Cash Management Motion, the Debtors may make changes to their Cash Management System and/or amend a Cash Management Bank's existing controls over the Bank Accounts that are in place.

### 2.    Existing Business Forms and Records

124.    In the ordinary course of the Debtors' business, the Debtors use a variety of checks, business letterhead, purchase orders, invoices, envelopes and other business forms and correspondence (collectively, the "Business Forms"). Because the Business Forms were used Pre-Petition, they do not reference the Debtors' current status as a debtor in possession. To minimize expense to the estates, the Debtors request authority to continue to use all existing Business Forms without reference to their "debtor in possession" status. By virtue of the nature and scope of the Debtors' business operations, it is vital that the Debtors be permitted to continue to use the existing Business Forms without alterations or change. If new Business Forms are ordered, such Business Forms will include the legend "debtor in possession" with the corresponding bankruptcy case number. As with the existing Cash Management System, requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates.

125.    In the ordinary course of their businesses, the Debtors maintain certain books and records in connection with the operations of their businesses (collectively, the "Books and Records"). Continuing to use the Books and Records subsequent to the Petition Date rather than

closing those and opening new books will enable the Debtors to avoid unnecessary cost and burden.

### 3.    The Debtors' Bank Accounts and Cash Management Banks

126.    The Debtors currently utilize four Bank Accounts in their cash management system.  The BMO account is the primary account that receives electronic deposits, mailed deposits, wire transfers and other receipts.  The Debtors also deposit cash receipts sent to the Debtors' home office into one of the Old National accounts.  These two accounts, in addition to being used to pay suppliers, government units and other creditors, also fund two payroll accounts located at Chase National and Old National.  This system allows the Debtors to efficiently monitor their cash flow, and it is therefore in the best interests of the Debtors' estates, and the Debtors' creditors, that the system be allowed to continue.

127.    The Debtors may have daily Bank Account balances in excess of $250,000.00. As such and to the extent necessary, the Debtors seek a waiver on an interim basis of the deposit guidelines set forth in section 345(b) of the Bankruptcy Code in order to continue their Pre-Petition practices, without prejudice to the Debtors' ability to seek a further interim or final waiver.

### E.    Debtors' Motion Pursuant to Bankruptcy Code Sections 105(A) and 366 for Interim and Final Orders; (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Services; (II) Deeming Utility Companies Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion").

128.    The Debtors maintain accounts with utility providers (collectively, the "Utility Companies") for various utility services (collectively, the "Utility Services"), including electricity, natural gas, water, sewer, waste disposal and telecommunications services and similar utility products and services.  Attached to the Utilities Motion as Exhibit A is a list of substantially all of the Utility Companies that provide Utility Services to the Debtors as of the

Petition Date, along with, among other things, the average monthly cost of such Utility Services. The relief requested herein is requested with respect to all Utility Companies, and is not necessarily limited to those listed on Exhibit A.[15]

129.    Prior to the Petition Date, the Utility Companies provided Utility Services to the Debtors at various locations.  Ordinarily, depending on the underlying agreements, the Debtors pay the Utility Companies upon receipt of monthly invoices for the Utility Services.  Two of the Utility Companies hold Pre-Petition deposits from the Debtors as indicated on Exhibit A.  In general, the Debtors have established a good payment history with virtually all of the Utility Companies and have made payments on a regular and timely basis.  To the best of the Debtors' knowledge, there are no material defaults or arrearages of any significance with respect to the Debtors' undisputed Utility Services invoices.[16]

130.    On average, prior to the Petition Date, the Debtors spent approximately $57,259.20 each month on account of Utility Services.

131.    Uninterrupted Utility Services are essential to the Debtors' continued operations. If any Utility Company altered, refused or discontinued service, even for a brief period, the Debtors' businesses could be severely disrupted, jeopardizing the Debtors' reorganization efforts.

---

[15]    While the Debtors have exercised their reasonable best efforts to list all of their Utility Companies on Exhibit A to the Utilities Motion, it is possible that certain Utility Companies may have been inadvertently omitted from this list.  Accordingly, the Debtors reserve the right, pursuant to the terms and conditions of the Utilities Motion and without further order of the Court, to amend Exhibit A to add any Utility Companies that were omitted therefrom and to request that the relief requested herein apply to such entities as well.  In addition, the Debtors reserve the right to argue that any of the entities now or hereafter listed in Exhibit A are not "utilities" within the meaning of section 366(a) of the Bankruptcy Code.

[16]    On November 21, 2013, the Town of Oolitic informed the Debtors that the Oolitic Water Works had incorrectly billed the Debtor since 2003, invoicing the Debtors for only approximately 10% of the Debtors actual consumption.  After apologizing, the Town of Ooitic informed the Debtors that the Debtors' corrected balance due was $21,013.28.  Since the Debtors' were informed of the Town of Oolitic's error, the Debtors have paid the corrected invoices as they come due, but have not paid the alleged balance of $21,013.28.  The Debtors reserve all rights with respect to the Town of Oolitic and Oolitic Water Works including, but not limited to, the alleged balance of $21,013.28.

**F.     Debtors' Motion Pursuant to Sections 105(a), 363(b), 363(c) and 1107(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004(h) for an Order (I) Authorizing Debtors to (A) Continue Insurance Policies and Agreements Relating Thereto, and (B) Honor Certain Pre-Petition Obligations in Respect Thereof; and (II) Granting Related Relief (the "Insurance Motion")**

132.    In connection with the operation of their businesses, the Debtors maintain insurance policies (each, an "Insurance Policy" and, collectively, the "Insurance Policies") through third-party insurance carriers (the "Insurance Carriers").    Annexed to the Insurance Motion as <u>Exhibit A</u> is a non-exclusive list of the Debtors' current Insurance Policies and corresponding Insurance Carriers.[17]    As set forth below, the Insurance Policies insure against claims and losses relating to, among other things, general liability, automobile liability, fiduciary liability, business interruption and property loss.

### 1.      Brokers

133.    Hylant Group, Inc. (the "Broker") serves as the Debtors' insurance broker. Among other things, the Broker represents the Debtors in negotiations with the Debtors' insurers.  Employment of the Broker has allowed the Debtors to obtain the insurance coverage necessary to operate their businesses in a reasonable and prudent manner and to realize savings in the procurement of such policies.  The Debtors believe that it is in the best interests of their creditors and estates to continue their business relationship with the Broker.

134.    The Debtors pay fees to the Broker (the "Brokerage Fees") upon the signing or renewal of certain policies, and the Brokerage Fees are bundled into the premium costs for each insurance policy the Debtors maintain.  The Debtors are current on all premiums and surcharges owing under the Insurance Policies as of the Petition Date, and hereby seek authorization to

---

[17]    Notwithstanding the Debtors' diligence, the Debtors currently may have certain Insurance Policies that are not reflected on <u>Exhibit A</u> to the Insurance Motion.  The Debtors' failure to include a particular Insurance Policy on <u>Exhibit A</u> shall not operate to exclude that policy from the coverage of Insurance Motion or any order of the Court entered in connection with the Insurance Motion.

continue to pay these premiums and surcharges (a portion of which covers Brokerage Fees) in the ordinary course of their business.  Further, the Debtors request authority to pay, in their discretion, any Brokerage Fees or other amounts owing to the Broker that may subsequently be determined to be owed for periods prior to the Petition Date, as the Debtors' failure to pay such amounts could result in a loss of the Broker's assistance in maintaining the Debtors' beneficial business relationships with the Debtors' insurance carriers.

### 2.     Insurance Policies

#### (a)     General Liability

135.     The Debtors maintain a general liability insurance policy (the "GL Policy") with the Charter Oak Fire Insurance Company ("Charter Oak").  The GL Policy provides coverage for claims relating to, among other things, third party liability arising from personal injury and advertising injury, products and completed operations liability, damage to premises, and employee benefits liability.  The coverage limits under the Charter Oak policy are: (i) $2,000,000 in the general aggregate; (ii) $2,000,000 for products-completed operations (does not apply to general aggregate); (iii) $1,000,000 for Personal advertising injury; (iv) $1,000,000 for each occurrence; (v) $100,000 for premises rented to the Debtors; and (vi) $5,000 for medical expense per person.

136.     The GL Policy does not have a deductible.  The Debtors' annual premiums under the GL Policy (including applicable taxes and fees) total approximately $18,654.  The GL Policy is scheduled to expire on February 28, 2014.  The GL Policy automatically renews annually unless either party provides notice.  Prior to the Petition Date, the notice period ended. Therefore, the Debtors and Charter Oak agreed to renew the GL Policy for an annual premium of $20,310.

## (b)    **Automobile Liability**

137.    The Debtors maintain an automobile liability insurance policy (the "Auto Policy") with Travelers Property Casualty Company of America (along with any affiliated company, "Travelers"). The Auto Policy covers claims relating to automobiles owned and/or rented or operated by the Debtors, including personal injury claims and claims for medical payments, as well as losses resulting from physical damage to the Debtors' vehicles.

138.    The Auto Policy requires the Debtors to pay a $500 deductible per vehicle for physical damage, and provides a $1,000,000 limit on coverage. The Debtors' annual premiums under the Auto Policy (including applicable taxes and fees) total approximately $22,506. The Auto Policy is scheduled to expire on February 28, 2014. The Auto Policy automatically renews annually unless either party provides notice. Prior to the Petition Date, the notice period ended. Therefore, the Debtors and Travelers agreed to extend the Auto Policy for one year for an annual premium of $24,493.

## (c)    **Umbrella Liability**

139.    The Debtors maintain an umbrella liability insurance policy (the "Umbrella Policy") with Travelers. The Umbrella Policy respectively provides supplemental coverage for claims in excess of applicable coverage limits under certain other Insurance Policies, or certain other claims that are not covered under the Insurance Policies. The Umbrella Policy provides coverage for losses up to $10,000,000 in the aggregate.

140.    The Debtors' annual premiums for the Umbrella Policy are approximately $13,000 (including applicable taxes and fees). The Umbrella Policy is scheduled to expire on February 28, 2014. The Umbrella Policy automatically renews annually unless either party provides notice. Prior to the Petition Date, the notice period ended. Therefore, the Debtors and Travelers agreed to extend the Umbrella Policy for one year for an annual premium of $13,000.

**(d)    Property**

141.    The Debtors maintain a property insurance policy with Charter Oak (the "Property Policy"). The Property Policy provides coverage for direct physical loss or damage to the Debtors' real property and any personal property held or stored thereon, including property of others in the custody of the Debtors (if the Debtors are obligated to insure such property) and property in transit. Specifically, the Property Policy covers (among other things, and subject to varying limits): (a) accounts receivable; (b) earthquake damage; (c) equipment breakdown; (d) flood; (e) pollutant clean up; and (f) various personal property. The Property Policy provides coverage for property losses up to $7,457,797 (buildings), $8,677,950 (business personal property excluding stock), and $1,000,000 (personal property of others). Additionally, the Property Policy provides limits to coverage for dozens of other types of property and damage caused by natural events.

142.    The deductibles under the Property Policy vary from approximately $1,000 to $100,000 based on category of loss. The annual premiums payable under the Property Policy total approximately $25,515. The Property Policy is scheduled to expire on February 28, 2014. The Property Policy automatically renews annually unless either party provides notice. Prior to the Petition Date, the notice period ended. Therefore, the Debtors and Travelers agreed to extend the Property Policy for one year for an annual premium of $28,130.

**(e)    Directors and Officers Liability, Fiduciary Liability and Employment Practices Liability**

143.    The Debtors' equity holder, North Coast Minerals, LLC, maintains a directors and officers liability, fiduciary liability and employment practices insurance policy (the "D&O/Fiduciary/EPL Policy") with Travelers. This policy covers losses on account of, among other things: (a) claims asserted against the Debtors' directors and officers for wrongful acts;

(b) the Debtors' indemnification obligations with respect to claims made against directors and officers; (c) claims asserted against the Debtors for wrongful acts; (d) any actual or alleged breaches of responsibilities, obligations or duties imposed upon fiduciaries of the Debtors' employee benefit programs; (e) any actual or alleged act, error or omission in the administration of any of the Debtors' employee benefit programs; and (f) losses arising from employment-related claims (*e.g.*, discrimination, wrongful discharge, and sexual harassment claims) that may be asserted by the Debtors' current or former employees.

144.    Premiums for the D&O/Fiduciary/EPL Policies total approximately $38,361.00 annually and have been paid in full.  The coverage limits under the D&O/Fiduciary/EPL Policies is  $5,000,000  with  a  supplemental  personal  indemnification  of  $500,000.    The D&O/Fiduciary/EPL Policies are scheduled to expire on March 26, 2014.

145.    As described in the Reutell Declaration, the Debtors intend to sell substantially all of their assets through an auction pursuant to section 363 of the Bankruptcy Code.  Under the D&O/Fiduciary/EPL Policy, such a sale could constitute a change of control of the directors and officers, and may: (i) terminate coverage going forward and; (ii) necessitate a separate premium to maintain coverage for any liability arising out of actions or omissions that took place before the change of control.  Therefore, the Debtors request the authority to enter into new insurance policies that will provide coverage to the Debtors' officers and directors from the moment of a change of control and for acts or omissions that occurred before a change of control.[18]

### (f)      **Boiler and Machinery**

146.    The Debtors maintain a Boiler and Machinery policy (the "B&M Policy") with Travelers.  The B&M Policy covers claims relating to mechanical equipment owned and/or

---

[18]       The Debtors believe that entering into supplemental D&O/Fiduciary/EPL policies would be an ordinary course of business transaction and only ask for authority to do so out of an abundance of caution.

rented or operated by the Debtors, including personal injury claims and claims for medical payments, as well as losses resulting from physical damage to the Debtors' equipment.

147.    The B&M Policy requires the Debtors to pay a $2,500 deductible per vehicle for physical damage, and provides a $16,365,755 limit on coverage.  The Debtors' annual premiums under the B&M Policy (including applicable taxes and fees) total approximately $1,522.  The B&M Policy is scheduled to expire on February 28, 2014.  The B&M Policy automatically renews annually unless either party provides notice.  Prior to the Petition Date, the notice period ended.  Therefore, the Debtors and Travelers agreed to renew the B&M Policy for one year for an annual premium of $1,473.

### (g)    Commercial Inland Marine

148.    The Debtors maintain a Commercial Inland Marine policy (the "Marine Policy") with the Great American Insurance Company of New York.  The Marine Policy covers claims relating to marine equipment owned and/or rented or operated by the Debtors, including personal injury claims and claims for medical payments, as well as losses resulting from physical damage to the Debtors' equipment.

149.    The Marine Policy requires the Debtors to pay a $10,000 deductible for all property damage except for employee tools which requires a $500 deductible.  The Marine Policy provides a $12,225,295 limit on coverage.  The Debtors' annual premiums under the Marine Policy (including applicable taxes and fees) total approximately $45,702.  The Marine Policy is scheduled to expire on February 28, 2014.  The Marine Policy automatically renews annually unless either party provides notice.  Prior to the Petition Date, the notice period ended. Therefore, the Debtors and Travelers agreed to renew the Marine Policy for one year for an annual premium of $42,850.

G.    **Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363, 364, 503(b), 1107(a) and 1108 and Fed. R. Bankr. P. 6003 and 6004 (A) Authorizing the Debtors to (I) Honor Certain Pre-Petition Obligations Owed to Certain Critical Vendors and (II) Continue Pre-Petition Practices with Certain Critical Vendors, and (B) Authorizing all Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers. (the "Critical Vendor Motion")**

150.    In their day-to-day operations, the Debtors heavily rely on many suppliers and service providers.  Like many large companies who extract natural resources, the Debtors rely on vendors such as manufacturers of heavy equipment, suppliers of natural resources used in the quarrying process, and the suppliers of the custom-made packaging materials they use to ship products to their customers.

151.    The Debtors were able to distinguish, from the several hundreds of vendors with whom the Debtors deal, a small group of vendors that the Debtors deem to be Critical Vendors. These vendors provide goods and services to the Debtors necessary to keep their operations running by: being the sole local source of vital machinery; the sole supplier for custom supplies and parts; and/or being the sole quality service provider in the area.

152.    The Debtors believe that the goods and services supplied by certain of their vendors are critical to their operations in that their business could not continue to operate without access to such goods and services.  Certain of the Critical Vendors have claims for parts, components, equipment, raw materials and services provided and other goods (the "Goods") provided to the Debtors that were received by the Debtors before the Petition Date.[19]  The Debtors estimate that, as of the Petition Date, the total outstanding amount owed to the Critical Vendors is approximately $250,000 (the "Critical Vendor Claims").

---

[19]    These Goods may include both those Goods that were received by the Debtors within the twenty day period prior to the Petition Date, which are entitled to priority status under section 503(b)(9) of the Bankruptcy Code, and those Goods that were received by the Debtors prior to the twenty day period before the Petition Date, which are not entitled to priority status under section 503(b)(9) of the Bankruptcy Code.

153.    If the Debtors are unable to honor these obligations, the Debtors face the real possibility that the Critical Vendors may refuse to continue to deliver the Goods to the Debtors - Goods essential to the operation of the Debtors' business and critical to maintaining the going-concern value of the Debtors' business and assets while they evaluate their strategic options.

**H.    Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(A), 363(B), 363(C), 1107(A), and 1108 and Fed. R. Bankr. P. 6003 and 6004 (A) Authorizing the Debtors to Honor Pre-Petition Obligations to and Continue Pre-Petition Practices with Shippers, Warehousemen and Other Lien Claimants, and (B) Authorizing All Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers (the "Shippers and Warehousemen Motion").**

**1.    <u>The Shippers</u>**

154.    In the ordinary course of their business, the Debtors engage Shippers in various aspects of their business including, but not limited to, moving both finished and unfinished limestone between quarries, warehouse facilities and customers, as well as transporting the other materials necessary for the Debtors' operations. To facilitate efficient and timely shipment and delivery, the Debtors rely upon the services of the Shippers. It is critical to the Debtors' operations and efforts to maximize the value of their estates that they maintain a reliable and efficient transport system to ensure timely shipment and delivery of materials and goods, which will require the continued and uninterrupted services of the Shippers.

155.    Any failure by the Debtors to honor their obligations to the Shippers (the "Shipper Obligations") will likely have a materially adverse impact on the reliability and efficiency of the current transport system. If Shipper Obligations remain unpaid, the Debtors face the real possibility that certain of the Shippers may refuse to continue their respective services. Further, under some state laws, a shipper may have a lien on the goods in its possession, which secures the charges or expenses incurred in connection with the transportation and/or storage of the

goods.[20]   Accordingly, certain Shippers may assert that they are entitled to possessory liens for transportation, shipment and delivery or storage of the Debtors' materials and goods in their possession and may refuse to deliver or release such materials and goods before their claims have been satisfied and their liens redeemed.[21]

156.   To avoid any potential interruption or delay in the Debtors' transport system, which interruption or delay will likely have a material adverse impact on the Debtors' operations and efforts to maximize the value of their estates, it is imperative that the Debtors have the ability to satisfy Shipper Obligations in order to maintain the continued and uninterrupted services of the Shippers.

157.   In satisfying any Shipper Obligations, the Debtors will, in their discretion, attempt to condition any payment on the written acknowledgement from the applicable Shipper that such Shipper will continue to provide its services to the Debtors on terms that, at a minimum, it provided to the Debtors prior to the Petition Date, or such other trade practices and programs that are at least as favorable to the Debtors as those in effect prior to the Petition Date.  The Debtors reserve the right to negotiate more favorable trade terms with any Shipper as a condition to payment of any such Shipper Obligation.  Further, the Debtors will only pay the claims of the Shippers that they believe, in their business judgment, are necessary or appropriate.   In determining whether such payments are necessary or appropriate, the Debtors will consider:  (a) whether the benefits to the Debtors' estates and creditors from making such payments would

---

[20]   For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."  U.C.C. § 7-307(1) (2003).

[21]   Notwithstanding the foregoing, the Debtors do not believe that the Shippers have the right to refuse performance or assert liens.  The Debtors do not waive and hereby reserve all rights and defenses in the event a Shipper asserts a lien or any other charge or interest in the Debtors' property.

exceed (i) the costs that the Debtors would incur by bringing actions to compel the turnover of such goods and (ii) the delays associated with such actions; and (b) whether the additional expenses the Debtors would incur (in the form of premium shipping and storage costs) to replace the Shippers would exceed the amount of unpaid Pre-Petition claims.

158.     Over the past six months, the average aggregate monthly amount of Shipper Obligations was approximately $40,000.  As of the Petition Date, the Debtors estimate that the aggregate outstanding amount of Shipper Obligations is approximately $48,000.

### 2.     **Warehouse Facilities**

159.     In the ordinary course of the Debtors' business, the Debtors regularly utilize the services of third-party warehouses to store goods in transit, which are being shipped to the Debtors' customers and goods that are being processed.

160.     Any failure by the Debtors to honor their obligations to the Warehousemen (the "Warehousemen Obligations") will likely have a materially adverse impact on the reliability and efficiency of the current warehousing and transport system.   If Warehousemen Obligations remain unpaid, the Debtors face the real possibility that certain of the Warehousemen may refuse to continue their respective services.  Further, under some state laws, a Warehousemen may have a lien on the goods in its possession, which secures the charges or expenses incurred in the storage of the goods.  Accordingly, certain Warehousemen may assert that they are entitled to possessory liens for storage of the Debtors' materials and goods in their possession and may refuse to deliver or release such materials and goods before their claims have been satisfied and their liens redeemed.[22]

---

[22]     Notwithstanding the foregoing, the Debtors do not believe that the Warehousemen have the right to refuse performance or assert liens. The Debtors do not waive and hereby reserve all rights and defenses in the event a Warehouseman asserts a lien or any other charge or interest in the Debtors' property.

161.    To avoid any potential interruption or delay in the Debtors' distribution and storage system, which interruption or delay will likely have a material adverse impact on the Debtors' operations and efforts to maximize the value of their estates, it is imperative that the Debtors have the ability to satisfy Warehousemen Obligations in order to maintain the continued and uninterrupted services of the Warehousemen.

162.    Over the past six months, the average aggregate monthly amount of Warehousemen Obligations was approximately $2,600.  As of the Petition Date, the Debtors estimate that the aggregate outstanding amount of Warehousemen Obligations is approximately $1,150.

### 3.    Other Lien Claimants

163.    In the ordinary course of the Debtors' business, the Debtors sometimes require the services of the Lien Claimants, who are primarily third-party service providers that install, repair and/or replace various parts and components essential to the continued and uninterrupted operation of the Debtors' equipment and machinery.  Although the Debtors have the capability to perform certain routine repairs and maintenance, when necessary, the Debtors rely heavily upon the highly-skilled or critically-located Lien Claimants to provide timely repairs and maintenance to equipment parts and components. Prior to the Petition Date, the Lien Claimants performed such services both on-site, as well is in their respective repair shops.  At any given time, the Debtors may have certain critical parts and components in the process of being serviced by the Lien Claimants.

164.    As of the Petition Date, the Debtors believe that there are no outstanding amounts owed to the Lien Claimants.

165.    In the event that there are any outstanding obligations to the Lien Claimants (the "Lien Claimant Obligations") that are not honored, however, the Debtors face the real possibility

that certain of the Lien Claimants may refuse to continue their respective services for the Debtors, including repair, maintenance, installation and other servicing obligations—services critical to the reliability and efficiency of the Debtors' operations.  Additionally, the Debtors' failure to pay the Lien Claimants likely would result in the Lien Claimants having a right to assert liens or interests against the Debtors' property.  Pursuant to section 362(b)(3) of the Bankruptcy Code, acts to perfect such liens or interests, to the extent consistent with section 546(b) of the Bankruptcy Code, are expressly excluded from the automatic stay otherwise established by section 362(a) of the Bankruptcy Code.  Moreover, under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection."[23]  Therefore, notwithstanding the automatic stay established by section 362 of the Bankruptcy Code, many of the Lien Claimants may attempt to perfect and assert liens or interests against the Debtors' property.  Thus, they would hold secured claims that would, in any event, be required to be paid in full under section 1129(b)(2)(A) of the Bankruptcy Code.  Finally, in some situations, the Lien Claimants may be in possession of critical property of the estate and may assert possessory liens and interests and a right to retain the property pending payment in full of their lien claims.  In such situations, the value of the property likely will outweigh the amount of the lien claims.  It would be detrimental to the Debtors' estates not to have an authorized means by which the property can be quickly retrieved without legal action.

166.    Accordingly, it is imperative that the Debtors have the ability to satisfy all Lien Claimant Obligations to the extent discovered by the Debtors.

---

[23]    The Debtors do not concede that any liens (contractual, common law, statutory or otherwise) described in the Shippers and Warehouseman Motion are valid, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of all such liens, and/or to seek avoidance thereof.

## <u>CONCLUSION</u>

167.    The Debtors' ultimate goal in these Chapter 11 Cases is to maximize the value of their estates for the benefit of their creditors.  To minimize any loss of value of the Debtors' businesses during the Debtors' transition into chapter 11, the Debtors' immediate objective is to engage in business as usual with as little interruption or disruption to operations as the Debtors evaluate all of their strategic options.  I believe that, if the Court grants the relief requested in the First Day Pleadings, the Debtors' prospects for achieving their overriding goal of maximizing value will be substantially enhanced.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 17th day of February, 2014, at Oolitic, Indiana.

TERRENCE J. REUTELL

*[Signature Page for First Day Declaration]*